UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK




-------------------------------------------------------------

DEPARTMENT OF AMAZONAS,
DEPARTMENT OF ATLANTICO,
DEPARTMENT OF BOLIVAR,
DEPARTMENT OF BOYACA,
DEPARTMENT OF CAQUETA,
DEPARTMENT OF CASANARE,
DEPARTMENT OF CESAR,
DEPARTMENT OF CHOCO,
DEPARTMENT OF CORDOBA,
DEPARTMENT OF CUNDINAMARCA,
DEPARTMENT OF HUILA,
DEPARTMENT OF LA GUAJIRA,
DEPARTMENT OF META,
DEPARTMENT OF NARIÑO,
DEPARTMENT OF PUTUMAYO,
DEPARTMENT OF QUINDIO,
DEPARTMENT OF RISARALDA,
DEPARTMENT OF SANTANDER,
DEPARTMENT OF SUCRE,
DEPARTMENT OF TOLIMA,
DEPARTMENT OF VALLE DEL CAUCA,
DEPARTMENT OF VAUPES, and
SANTA FE DE BOGOTÁ, CAPITAL DISTRICT,

       Plaintiffs,

-against-

PHILIP MORRIS COMPANIES, INC.,
PHILIP MORRIS INCORPORATED d/b/a
PHILIP MORRIS U.S.A.,
PHILIP MORRIS INTERNATIONAL, INC.,
PHILIP MORRIS PRODUCTS, INC., and
PHILIP MORRIS LATIN AMERICA SALES CORPORATION,

       Defendants.

-----------------------------------------------------------X

COMPLAINT

JURY TRIAL
DEMANDED

Docket No:

Plaintiffs, DEPARTMENT OF AMAZONAS, DEPARTMENT OF ATLANTICO, DEPARTMENT OF BOLIVAR, DEPARTMENT OF BOYACA, DEPARTMENT OF CAQUETA, DEPARTMENT OF CASANARE, DEPARTMENT OF CESAR, DEPARTMENT OF CHOCO, DEPARTMENT OF CORDOBA, DEPARTMENT OF CUNDINAMARCA, DEPARTMENT OF HUILA, DEPARTMENT OF LA GUAJIRA, DEPARTMENT OF META, DEPARTMENT OF NARIÑO, DEPARTMENT OF PUTUMAYO, DEPARTMENT OF QUINDIO, DEPARTMENT OF RISARALDA, DEPARTMENT OF SANTANDER, DEPARTMENT OF SUCRE, DEPARTMENT OF TOLIMA, DEPARTMENT OF VALLE DEL CAUCA, DEPARTMENT OF VAUPES, SANTA FE DE BOGOTÁ, CAPITAL DISTRICT, (collectively referred to as "THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA" or "PLAINTIFFS"), by and through the undersigned attorneys, for their complaint against Defendants, PHILIP MORRIS COMPANIES, INC., PHILIP MORRIS INCORPORATED, d/b/a PHILIP MORRIS U.S.A., PHILIP MORRIS INTERNATIONAL, INC., PHILIP MORRIS PRODUCTS, INC., and PHILIP MORRIS LATIN AMERICA SALES CORPORATION, (hereinafter referred to as "PHILIP MORRIS DEFENDANTS" or "PHILIP MORRIS") as follows:

## I. INTRODUCTION

1.      This is an action by the Plaintiffs, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, against the Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act of 1970, Title IX of the Organized Crime Control Act of 1970, as amended, 18 U.S.C. §§ 1961-68 ("RICO"), as well as for negligence, fraud, unjust enrichment, public nuisance, and acts of conspiracy.  The complaint seeks money damages and injunctive relief.

2

2.      The Defendants have on a continuing basis, directly and indirectly, smuggled cigarettes illegally into THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA in violation of United States law and common law, as well as customs agreements between the United States and the Republic of Colombia, for the purpose of injuring the economic interests of THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, while increasing their profits and market share in THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, enhancing the value of their tobacco operations, and expanding the worldwide market for contraband cigarettes.

3.      Treaties and agreements between the Republic of Colombia and the United States specifically confirm that there shall be reciprocal cooperation between the United States and the Republic of Colombia regarding government efforts to combat transnational crime and customs fraud. These treaties and agreements also confirm that the United States and the Republic of Colombia have a unity of objective in insuring the accurate assessment and collection of customs duties and other related fees and charges. The United States and the Republic of Colombia have determined that smuggling operations in breach of customs agreements and existing law are harmful to the economic, fiscal, and commercial interests of both the United States and the Republic of Colombia and, accordingly, it is of benefit to both nations to eliminate and remedy the effects of such operations.

4.      As a direct result of the illegal acts and course of conduct of the Defendants, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA have been injured in their business and property. THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA have lost, and continue to lose, billions of dollars, including the deprivation of customs duties, fees, taxes, money, and property by reason of the Defendants' scheme to smuggle vast shipments of contraband cigarettes

and other tobacco products into THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

This scheme also harms THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA by

supplanting sales of lawfully sold cigarettes on which duties and taxes would have been paid to

THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

     5.      Through actions undertaken in the United States and elsewhere, Defendants have

conceived, directed, controlled, and implemented an international conspiracy to defraud

Plaintiffs and deprive them of money and property, in order to increase their profits and market

share, enhance the value of their tobacco operations, and expand the worldwide market for

contraband cigarettes. By means of actions in this District and elsewhere, Defendants created

and exploited a sophisticated and clandestine smuggling enterprise that operates throughout the

world and within THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA. This

international scheme has harmed, and continues to harm, the economic interests of many

governments, including THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.


## II. PARTIES


     6.      The Plaintiffs, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA

and SANTA FE DE BOGOTÁ, CAPITAL DISTRICT, are autonomous legal subdivisions of the

Republic of Colombia. Each of THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA

and SANTA FE DE BOGOTÁ, CAPITAL DISTRICT, has rights and responsibilities

comparable to that of a state of the United States. Among the legal rights of THE

DEPARTMENTS OF THE REPUBLIC OF COLOMBIA is the right to hold a legal or beneficial

interest in property and receive money arising from the sale of tobacco products in the Republic

of Colombia.  THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA and SANTA FE

DE BOGOTÁ, DISTRICT CAPITAL, maintain their primary consular offices in the United

States through the Embassy of the Republic of Colombia at 2118 Leroy Place, Washington, D.C.

20007.

      7.     PHILIP MORRIS INTERNATIONAL, INC. is a Delaware corporation whose

principal place of business is located at 800 Westchester Avenue, Rye Brook, New York 10573.

PHILIP MORRIS INTERNATIONAL, INC. is a subsidiary of PHILIP MORRIS COMPANIES,

INC.  The Defendant, PHILIP MORRIS INTERNATIONAL, INC., is a citizen of the State of

New York.  During all relevant times herein, PHILIP MORRIS INTERNATIONAL, INC.

conducted continuous and systematic business in the State of New York, maintains a substantial

financial presence in the State of New York, utilizes offices in New York, and is otherwise

subject to the jurisdiction of the courts in the State of New York.

      8.     PHILIP MORRIS COMPANIES, INC. is a Virginia corporation whose principal

place of business is located at 120 Park Avenue, New York, New York 10017.  The Defendant,

PHILIP MORRIS COMPANIES, INC., is a citizen of the State of New York.  PHILIP MORRIS

COMPANIES, INC. is the parent corporation of PHILIP MORRIS INC. and PHILIP MORRIS

INTERNATIONAL, INC.  During all relevant times herein, PHILIP MORRIS COMPANIES,

INC. conducted continuous and systematic business in the State of New York, maintains a

substantial financial presence in the State of New York, utilizes offices in New York, and is

otherwise subject to the jurisdiction of the courts in the State of New York.

      9.     PHILIP MORRIS INCORPORATED, d/b/a "PHILIP MORRIS U.S.A.", a

subsidiary of PHILIP MORRIS COMPANIES, INC., is a Virginia corporation with its principal

place of business located at 120 Park Avenue, New York, New York 10017.  As such, the

5

Defendant, PHILIP MORRIS INCORPORATED, is a citizen of the State of New York. PHILIP

MORRIS INCORPORATED conducts business under the trade name "PHILIP MORRIS

U.S.A." and is engaged, along with its subsidiaries and affiliates, in the manufacture and sale of

cigarettes. It is the largest cigarette company in the United States, and owns seven

manufacturing and processing facilities in the United States.

      10.    PHILIP MORRIS PRODUCTS, INC., a subsidiary of PHILIP MORRIS

INTERNATIONAL, INC., is a Virginia corporation with its primary place of business at 2001

East Walmsley Boulevard, Richmond, Virginia 23234.

      11.    PHILIP MORRIS LATIN AMERICA SALES CORPORATION, a subsidiary of

PHILIP MORRIS INTERNATIONAL, INC., is a Delaware corporation with its primary place of

business located at 800 Westchester Avenue, Rye Brook, New York 10573. The foregoing

PHILIP MORRIS-related entities are collectively referred to herein as the "PHILIP MORRIS

DEFENDANTS" or "PHILIP MORRIS."

      12.    The PHILIP MORRIS DEFENDANTS are and were, during all relevant times,

affiliated, consolidated, combined, and unitary entities for purposes of tobacco operations and

related activities. Tobacco operations were departments within the PHILIP MORRIS

DEFENDANTS' corporate family. The PHILIP MORRIS DEFENDANTS maintain control of

tobacco operations worldwide through a web of affiliated entities. This integrated and unitary

corporate structure was and is an essential aspect of PHILIP MORRIS DEFENDANTS'

successful efforts to surreptitiously direct tobacco smuggling in THE DEPARTMENTS OF THE

REPUBLIC OF COLOMBIA.

      13.    PHILIP MORRIS COMPANIES, INC. has adopted a "worldwide" policy that

purports to exercise control of the activities of its employees, as well as those of its direct and

indirect subsidiaries. Under this policy, which is said to be monitored and enforced by its Audit Committee, PHILIP MORRIS COMPANIES, INC. has undertaken responsibility for the acts of the employees of the PHILIP MORRIS DEFENDANTS, wherever taken, including acts related to smuggling activities within Colombia.

14.     The PHILIP MORRIS DEFENDANTS are and were, during all relevant times, involved in directing, managing, and controlling smuggling operations within THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA. At all times pertinent to this Complaint, the PHILIP MORRIS DEFENDANTS, individually and through their employees, agents, joint ventures, co-conspirators, subsidiaries, divisions, or affiliated companies, actively directed, managed, and controlled the PHILIP MORRIS smuggling enterprise, and actively participated, conspired, assisted, encouraged, and otherwise aided and abetted one or more of the other defendants in the unlawful and fraudulent conduct alleged herein, all of which has affected and continues to affect foreign and interstate commerce in the United States.

15.     The PHILIP MORRIS DEFENDANTS are and were, during all relevant times, responsible for the acts and omissions of their employees, for acts undertaken within the general area of their authority and for the benefit of the PHILIP MORRIS DEFENDANTS. As alleged herein, the PHILIP MORRIS DEFENDANTS were central figures in the overall conspiracy that actively embarked on and extensively participated in the fraudulent scheme. By means of corporate policies that put PHILIP MORRIS DEFENDANTS' resources and strategy at the heart of the conspiracy, the PHILIP MORRIS DEFENDANTS were aggressor entities that acted to harm the economic interests of PLAINTIFFS.

### III.  JURISDICTION

16.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331, 1337 because this matter involves allegations of illegal behavior arising under the laws of the United States, including violations of RICO.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and involves parties of diverse citizenship. Furthermore, jurisdiction in this Court is proper pursuant to RICO.  18 U.S.C. §§ 1964(a), (c).  The Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).  The Plaintiffs are "persons" within the meaning of 18 U.S.C. § 1961(3).  Finally, this Court may exercise jurisdiction over Plaintiffs' non-federal claims pursuant to 28 U.S.C. § 1367 as this Court possesses both federal question and diversity jurisdiction.

### IV.  VENUE

17.     Venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because defendants reside, are found, have an agent, or transact affairs in this District. Venue is also proper in this Court pursuant to 18 U.S.C. § 1965(b) because, to the extent any defendant may reside outside of this District, the ends of justice require such defendant or defendants to be brought before the Court. Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(b)(2).  Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(d) because a foreign corporation may be sued in any district.  Alternatively, venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2).

## V. THE INTERNATIONAL SMUGGLING SCHEME

18.     Beginning in the late 1970s and continuing through the present day, the PHILIP

MORRIS DEFENDANTS, in conducting one of their primary businesses of selling tobacco

products worldwide, have launched and conducted a consistent and concerted campaign to

increase their market share in the countries in which their products are sold.

19.     To accomplish this end, the PHILIP MORRIS DEFENDANTS have actively

engaged in smuggling activities and concealed such conduct through illegal acts, including

money laundering, wire fraud, mail fraud, and other violations of United States law.  Defendants

have collaborated with smugglers, encouraged smugglers, and sold cigarettes to smugglers,

either directly or through intermediaries, while at the same time supporting the smugglers' sales

through the establishment and maintenance of so-called "umbrella operations" in the target

jurisdictions.  "Umbrella operations" are legal routes for distribution of duty-paid cigarettes that

enable the import of a small volume of cigarettes by Defendants into the DEPARTMENTS OF

THE REPUBLIC OF COLOMBIA, while serving the overarching purpose of providing cover

for, and otherwise concealing, the Defendants' massive smuggling of contraband cigarettes into

the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.  By such acts, among others, the

Defendants embarked upon and pursued a scheme to smuggle cigarettes on a worldwide basis,

including within THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, in order to

deprive Plaintiffs of money and property, while increasing the sales of their products, profits, and

market share, and enhancing the value of their tobacco operations.

20.     By encouraging, supporting, facilitating, controlling and directing the activities of

the smugglers engaged in the sale, marketing and distribution of contraband cigarettes

throughout THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, the PHILIP
MORRIS DEFENDANTS have achieved multiple benefits for themselves, including but not
limited to the following:

      a.     The Defendants have increased their cigarette sales because they have new
and additional customers, namely, the smugglers and their customers.

      b.     By causing the evasion of taxes and duties, and under-invoicing their
products, the Defendants have increased their cigarette sales and otherwise obtained illicit
profits.

      c.     The Defendants have increased their market share by making their
cigarettes available to the general public within THE DEPARTMENTS OF THE REPUBLIC OF
COLOMBIA at prices below those which could be charged by their competitors whose products
are sold lawfully and which, therefore, are more expensive.

      d.     The Defendants have utilized the existence of smuggling into North
America, Europe, and South America as a public-relations vehicle and political tool by which to
lobby the Republic of Colombia and THE DEPARTMENTS OF THE REPUBLIC OF
COLOMBIA, the United States Congress and the legislatures of the various states of the United
States to reduce or eliminate cigarette taxes under the pretense that high cigarette taxes promote
smuggling and other crimes.  As a consequence of Defendants' direct and indirect representations
to Plaintiffs, the Republic of Colombia and/or government officials of THE DEPARTMENTS
OF THE REPUBLIC OF COLOMBIA, were mislead concerning the actual cause of smuggling
-- the Defendants' conduct.  The Defendants employed this lobbying scheme while falsely
denying and concealing their complicity in smuggling activities.

e.        The Defendants have enhanced the market value of their tobacco operations, while decreasing the market value of their competitors.

f.        The PHILIP MORRIS DEFENDANTS and other tobacco companies worldwide share a common interest and goal to implement a scheme to promote the activities of smugglers in that they coordinate their public-relations efforts and jointly fund their public-relations vehicles as a continuing joint campaign to achieve greater demand for their cigarettes worldwide. The existence of smuggling as encouraged by the Defendants has constituted the "self-fulfilling prophecy" that high cigarette taxes will only cause smuggling. The Defendants, through their various public-relations vehicles, utilize the data concerning smuggling, the hazards of smuggling, and the lost revenues associated with smuggling, as a method by which to encourage or pressure the United States, the Republic of Colombia and THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, and other countries to reduce or eliminate their cigarette taxes. The Defendants conduct this public relations and lobbying campaign without disclosing to the public or Plaintiffs their continuing complicity in smuggling.

21.        Additionally, the PHILLIP MORRIS DEFENDANTS individually and/or jointly work in concert with various distributors and large-scale smugglers of cigarettes to ensure that their objectives as set forth above are achieved.

22.        The PHILIP MORRIS DEFENDANTS, jointly and as individual corporations, encourage, promote, facilitate, cooperate with, and control the smuggling of cigarettes into THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA in a variety of ways, including but not limited to the following:

a.        The Defendants knowingly sell cigarettes directly to smugglers or to distributors whom Defendants know are selling the cigarettes to smugglers.

b.     The Defendants knowingly sell large quantities of cigarettes to entities and/or destinations in which Defendants know from their marketing studies that the legitimate demand for cigarettes cannot possibly account for the orders placed, thereby demonstrating that the Defendants know that their cigarettes are being sold for illegal purposes.

c.     The Defendants knowingly label, mislabel, or fail to label their cigarettes in such a way that they facilitate the activities of the smugglers.

d.     The Defendants provide marketing information to the distributors and to the smugglers so that the smugglers will order, purchase, sell, and distribute the cigarettes manufactured by the Defendants that are in greatest demand in the area of ultimate consumption of the smuggled cigarettes.

e.     The Defendants generate false or misleading invoices, bills of lading, shipping documents, and other documents that expedite the smuggling process.

f.     The Defendants engage in a pattern of activity by which they ship cigarettes designated for one port knowing that in fact the cigarettes will be diverted to another port so as to be smuggled.

g.     The Defendants make arrangements by which the cigarettes in question can be paid for in such a way as to be virtually untraceable.

h.     The Defendants make arrangements for the smuggled cigarettes to be paid for into foreign accounts including Swiss corporations and/or Swiss bank accounts in an attempt to improperly utilize Swiss banking and privacy laws as a shield to protect the smugglers from government investigations concerning their activities.

i.     The mails and wires were used, or were caused to be used, in the furtherance of the above actions and constitute an unlawful scheme to defraud Plaintiffs.

12

23.     The Defendants know that smugglers have been purchasing their cigarettes in large quantities, either directly or indirectly, in order to smuggle cigarettes into THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

24.     The Defendants directed smuggling operations by giving instructions to distributors, shippers, shipping companies, retailers, and/or various other intermediaries, as well as the smugglers, so as to effectuate the sale of large amounts of contraband cigarettes in THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

25.     But for the active and knowing assistance of the Defendants, the smugglers could not have obtained, smuggled, and sold the large quantities of contraband cigarettes successfully for many years. But for the active assistance of the Defendants, the proceeds of the smuggling scheme could not have been laundered and delivered to the Defendants for their use in the smuggling enterprise.

26.     This vertical group, which consisted of the Defendants, the distributors, the shippers, the smugglers, currency brokers, and the Defendants' agents and subsidiaries who received payment for the cigarettes, worked together for the common purpose of engaging in a course of conduct to gain massive profits from the sale of cigarettes that were illegally sold in THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA while harming Plaintiffs' economic interests. The activities of this core group constitute a conspiracy in law and in fact.

27.     The PHILIP MORRIS DEFENDANTS have been complicit in cigarette smuggling for many years, and this scheme has been carried out by means of activities conducted throughout this District and throughout this State. Examples of the methods and means by which the PHILIP MORRIS DEFENDANTS have controlled, directed and facilitated the

smuggling of cigarettes into THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA include the following:

a.      The PHILIP MORRIS DEFENDANTS created a circuitous and clandestine distribution chain for the sale of cigarettes in order to facilitate smuggling within the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA. The PHILIP MORRIS DEFENDANTS own, either wholly or partially, and/or operate and/or license facilities in the United States that produce Marlboro cigarettes and other brands owned by PHILIP MORRIS DEFENDANTS. These cigarettes are produced both for domestic consumption and for export. The cigarettes produced for export bear distinctive markings as being tax exempt and specifically produced for export. These Marlboro cigarettes are then sold to affiliated or wholly owned distributors in Belgium and in other countries which, in turn, sell the cigarettes to distributors in the Caribbean and Central and South America. The purpose of this labyrinthian distribution structure is to sell, or cause the sale, to distributors that are known smugglers or business associates of smugglers within the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, while concealing such sales from government authorities. The decision to establish and maintain this distribution chain was made at the highest executive levels of the PHILIP MORRIS DEFENDANTS.

b.      These Caribbean, Central, and South American distributors maintain a close relationship with the Defendants for purposes of increasing the market share of the PHILIP MORRIS DEFENDANTS' products and for other commercial purposes within THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

c.      The PHILIP MORRIS DEFENDANTS conduct extensive and expensive advertising campaigns to promote the sales of their cigarette brands, specifically Marlboro,

within THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA. This is done in spite of the fact that the volume of their sales of legally imported Marlboro cigarettes does not justify the level of expense in advertising and related commercial campaigns. The purpose of this extensive advertising and promotional campaign is to increase the consumption and sale of Marlboro product, including smuggled Marlboro cigarettes. The decisions of the PHILIP MORRIS DEFENDANTS as to the amounts to be spent on advertising and the extent of advertising and the quality thereof within THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA are made by high-level executives within the PHILIP MORRIS DEFENDANTS.

      d.      The Defendant, PHILIP MORRIS LATIN AMERICA SALES CORPORATION, is one of the primary Defendants involved in the conspiracy. The Defendant, PHILIP MORRIS LATIN AMERICA SALES CORPORATION, developed and operates the "umbrella operation" which allows the PHILIP MORRIS DEFENDANTS to maintain a corporate presence in Colombia and to market and advertise the smuggled product. Individuals, including Peter Schreer and Fred Hauser, were either employees of PHILIP MORRIS LATIN AMERICA SALES CORPORATION and/or acted on behalf of this Defendant in conducting the activities set forth in this complaint.

      e.      On a regular basis, for at least the last decade, the PHILIP MORRIS DEFENDANTS have made, or caused the making of, false statements to Colombian customs authorities. The PHILIP MORRIS DEFENDANTS engage in a systematic process of "under-invoicing" their otherwise legitimately imported cigarettes into Colombia. Under-invoicing is the process by which the PHILIP MORRIS DEFENDANTS declare the value of a case of cigarettes as being less than its true value. The invoice price is the basis upon which the cigarettes are taxed within the Republic of Colombia. By declaring the cigarettes to be of less

than their fair value, the immediate benefit to the PHILIP MORRIS DEFENDANTS is that

PHILIP MORRIS affiliates do not pay the full tax that is due on each case of cigarettes. There is

also an indirect benefit to the PHILIP MORRIS DEFENDANTS in that by under-invoicing the

cigarettes, PHILIP MORRIS DEFENDANTS are able to manipulate the prices of both legally

sold and smuggled cigarettes in THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

These Defendants, or parties acting under their control and direction, have stated a declared

customs value for the Marlboro product imported by PHILIP MORRIS into Colombia which was

substantially below what would otherwise be the price for the product in the market of origin, the

United States, for sale to unrelated parties. These prices are reported by the PHILIP MORRIS

DEFENDANTS to the Colombian customs authorities as prices for sale to unrelated parties and

not as an inter-company transfer of goods. The Colombian customs authorities have relied on

these false representations to their economic detriment. Furthermore, the Defendants specifically

represent to the Colombian customs authorities that the prices reflected in the documents are

unaffected by the fact that the sale is from one PHILIP MORRIS DEFENDANT to another

PHILIP MORRIS DEFENDANT. However, in fact, the price ostensibly charged by PHILIP

MORRIS PRODUCTS, INC. to PHILIP MORRIS LATIN AMERICA SALES

CORPORATION is less than one half of the price that is actually charged to PHILIP MORRIS

DEFENDANTS' best customers. The PHILIP MORRIS DEFENDANTS have transmitted

dozens, if not hundreds, of such misleading documents to the government of Colombia by use of

the U.S. wires and/or mail. Payment for the cigarettes is made by wire transfer to PHILIP

MORRIS PRODUCTS, INC.'s account at Citibank in New York City. A substantial number of

the false or misleading documents that were sent to the Colombian government were executed by

A. Steven Roberts, vice-president of PHILIP MORRIS PRODUCTS, INC., from his offices in Richmond, Virginia.

      f.     This practice of systematic under-invoicing allows the PHILIP MORRIS DEFENDANTS to control the final retail price of the smuggled Marlboro product, as well as to minimize the loss at which, according to the Defendants, the PHILIP MORRIS DEFENDANTS operate in Colombia.  This practice in turn allows the PHILIP MORRIS DEFENDANTS to increase their market share at the expense of those entities that comply with the law.

      g.     The PHILIP MORRIS DEFENDANTS have created a dual system for the distribution of cigarettes within the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA comprised of unlawful and lawful sales. The PHILIP MORRIS DEFENDANTS conduct marketing studies and do extensive market analyses for the Colombian market in which they identify and assess their cigarette sales through two categories; (1) legal sales, known as "DP" (duty-paid) and (2) illegal sales, known as "DNP" (duty-not-paid).  One purpose of maintaining artificially low priced legal sales is to allow a corporate presence within their target markets – the so-called "umbrella operation" – in order to provide cover for, and otherwise conceal, their massive smuggling enterprise.  This corporate presence allows the PHILIP MORRIS DEFENDANTS to advertise and otherwise compete freely within their primary target markets. This distribution chain and marketing strategy, while being executed by the PHILIP MORRIS DEFENDANTS in Colombia and the PHILIP MORRIS distributors throughout the world, is a strategy and system used by the PHILIP MORRIS DEFENDANTS to disguise the actual illegal nature of the PHILIP MORRIS DEFENDANTS' distribution chain and marketing strategy.  The PHILIP MORRIS DEFENDANTS' legal imports of Marlboro cigarettes into Colombia amount to only a small fraction (4%) of their actual sales to Colombia.  PHILIP MORRIS

INTERNATIONAL, INC. was and is a central part of the smuggling conspiracy. PHILIP

MORRIS INTERNATIONAL, INC. was, in fact, the primary architect of the strategy by which

cigarettes were smuggled into Colombia. The majority of the acts set forth within this complaint

were undertaken at the direction of PHILIP MORRIS INTERNATIONAL, INC. or with its

consent.

        h.      In or about the early 1990s, Miami bank accounts of various PHILIP

MORRIS DEFENDANTS' cigarette distributors were frozen by United States law-enforcement

officials because funds credited to those accounts were laundered drug money. The freezing of

these accounts was well known to PHILIP MORRIS. By virtue of this event among others, the

PHILIP MORRIS DEFENDANTS were aware or should have been aware that their distributors

were handling proceeds of unlawful activity.

        i.      Since at least 1991, the PHILIP MORRIS DEFENDANTS were selling

cigarettes to individuals who they knew had a reputation as smugglers. As of 1994, court records

that were available to the PHILIP MORRIS DEFENDANTS demonstrate that one of those

individuals had actually told U.S. government informants that he was involved in drug

trafficking. Specifically, he had told U.S. law-enforcement agents that he was involved in the

"pool system" of drug trafficking whereby he would combine his load of drugs with those of

other drug dealers into a single large shipment destined for the United States. He went on to

explain that individual traffickers in the United States received the drugs and sold them for U.S.

currency. The traffickers would then deliver the cash to couriers approved by the drug lords who

would convert the cash into cashier's checks made payable to specific businesses owned by this

individual. The businesses to which these drug funds were delivered are identified by name in

the court documents. Accordingly, the fact that this individual was a drug trafficker and the

identity of the companies that he used to launder money were known or should have been known to the PHILIP MORRIS DEFENDANTS.  In spite of this fact, the PHILIP MORRIS DEFENDANTS continued to sell large volumes of cigarettes to this individual so that he could smuggle them into Colombia and use those sales to launder drug money.

   j.  The PHILIP MORRIS DEFENDANTS have had long-term relationships with various agents and distributors in Central America and the Caribbean.  It is publicly known that some of these agents and distributors have been investigated and/or indicted by the United States for money laundering.  When the PHILIP MORRIS DEFENDANTS became aware that their agents or distributors were accused of illegal activities, the PHILIP MORRIS DEFENDANTS did not sever their relationships with the agents or distributors.  Instead, they established a secretive and circuitous route by which they could sell cigarettes to those entities without detection by law enforcement.  For the past several years and continuing into the present, the PHILIP MORRIS DEFENDANTS have implemented a policy and procedure by which certain customers were required to purchase cigarettes only by ordering them through remote offices such as one in Uruguay.  Usually, orders may be placed to such an office only verbally over the telephone.  Often, any form of written communication with such an office is prohibited. When cigarette orders are placed through such an office, they are passed on to Maraval, a company based in Basel, Switzerland.  The agents and distributors must pay Maraval for the cigarettes.  Delivery of the cigarettes is arranged by another company called Weitnauer, also based in Switzerland.  The sole purpose of this convoluted procedure for secret orders, secret payments, and secret delivery of cigarettes was and is to conceal from law enforcement the fact that the PHILIP MORRIS DEFENDANTS were knowingly selling their cigarettes to distributors who were selling cigarettes into smuggling channels which reached, among other places, the

DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.  However, in spite of this ostensibly

arm's-length transaction, the PHILIP MORRIS DEFENDANTS actually controlled the sale of all

cigarettes sold by these agents and distributors, including those that were sold for smuggling.

Even as to smuggled cigarettes, the PHILIP MORRIS DEFENDANTS set a price for which

cigarettes must be sold.  If the agents, distributors, or smugglers did not sell the cigarettes for the

prices set by the PHILIP MORRIS DEFENDANTS, then these Defendants took punitive action

against the agents, distributors, and/or smugglers.  The requirement by the PHILIP MORRIS

DEFENDANTS that orders to the remote offices not be in writing is a further attempt by PHILIP

MORRIS to conceal its involvement in illegal activities.  A substantial proportion of the

cigarettes purchased through the aforesaid procedure were smuggled into THE DEPARTMENTS

OF THE REPUBLIC OF COLOMBIA.

　　　　　k.　　　The PHILIP MORRIS DEFENDANTS had long-standing relationships

with several of their distributors in the Caribbean and Central America.  Managerial employees

of the PHILIP MORRIS DEFENDANTS, including the one-time head of the Latin-America

Sales Division, actually maintained a partnership relationship with these distributors.  These

PHILIP MORRIS executives shared in the profits of these distributors as to the cigarettes that

were sold into smuggling channels.  The PHILIP MORRIS DEFENDANTS expedited the

smuggling of cigarettes through these distributors in two ways.  First, when a price increase for

product was imminent, the PHILIP MORRIS DEFENDANTS would advance order huge

volumes of cigarettes at the old, lower price such that the favored distributors would receive the

benefit of the old pricing, thereby increasing their profits.  Additionally, the PHILIP MORRIS

DEFENDANTS would grant exceptionally favorable financing terms to these distributors.  For

example, whereas most purchasers would be required to pay for their cigarettes in cash upon

delivery, certain distributors were allowed financing plans that allowed them sixty to seventy-five days to pay for the cigarettes. When one takes into account the total delivery time for cigarettes, this sixty to seventy-five day grace period allowed these distributors to keep two to three times more cigarettes in the "pipeline" than would be possible if payments were in cash upon delivery of the cigarettes. The PHILIP MORRIS DEFENDANTS granted these favorable financing arrangements to these distributors so as to maximize the amount of cigarettes that was available in smuggling channels.

l.       The executives of the PHILIP MORRIS DEFENDANTS have intentionally created a circuitous route by which the majority of cigarettes which are purchased for sale in Europe or South America must be paid for in Switzerland and are shipped from large warehouses used by PHILIP MORRIS in Belgium or other European countries. The primary purpose for establishing this distribution chain is to make it more difficult for investigators to distinguish between legitimately and illegitimately sold cigarettes and to make it difficult or impossible for legal authorities to track the payment for the cigarettes and the ultimate destination of the cigarettes. The PHILIP MORRIS DEFENDANTS knowingly engage in this practice because they derive enormous financial benefit from their sales of cigarettes to smugglers. Also, the PHILIP MORRIS DEFENDANTS achieve maximum market penetration and maximum market share by dumping billions of contraband cigarettes into South American and other markets at prices below the price by which legitimately sold cigarettes can be sold. In the early 1990s, distributors in the Caribbean and Central America who wished to sell Marlboro cigarettes to smugglers could order the cigarettes from Richmond, Virginia and have them shipped to Miami, Florida, and on to the distributor. However, beginning in approximately 1997, the PHILIP MORRIS DEFENDANTS, in an attempt to insulate themselves from the

distributors and the smugglers, established a more circuitous route by which the cigarettes would

be shipped to Antwerp and delivered to Weitnauer. The cigarettes would then be trucked from

Antwerp to Rotterdam. The cigarettes would then be shipped from Rotterdam to the distributor

in the Caribbean or Central America. Payment for the cigarettes would then be made to Maraval.

In spite of the fact that the routing of the cigarettes now included the involvement of two

additional companies and in spite of the fact that the distance over which the cigarettes must be

transported was drastically increased, the distributors in the Caribbean and Central America were

subjected to no price increase. The markups, handling charges, and additional shipping expenses

were absorbed by the PHILIP MORRIS DEFENDANTS so that they could insure that the flow

of their cigarettes into Colombia would continue as intended and that there would be no

reduction of market share associated with a price increase. The strategic plan for the scheme set

forth above was developed by all the named PHILIP MORRIS Defendants and, in particular, by

the Defendants', PHILIP MORRIS INTERNATIONAL, INC., PHILIP MORRIS PRODUCTS,

INC., and PHILIP MORRIS INCORPORATED d/b/a PHILIP MORRIS U.S.A.

       m.     In approximately 1997, PHILIP MORRIS DEFENDANTS restructured

international sales operation such that the vast majority of all cigarettes, both legal and

smuggled, sold into Europe, Central and South America were routed through Belgium. Ports and

warehouse districts of Belgium were selected because they were difficult for customs officials to

monitor. By routing billions of dollars of cigarettes through ports in Belgium, the PHILIP

MORRIS DEFENDANTS encouraged the development of a system by which those ports

became a center for smuggling activity. Employees of the PHILIP MORRIS DEFENDANTS

visited the docks and warehouses in Belgium on a routine basis for the purpose of meeting

customers, maintaining customer relations, and promoting the sale of new products. By virtue of

their presence at these facilities and by virtue of the discussions that they had on a routine basis, the employees and management of the PHILIP MORRIS DEFENDANTS were well aware of the high level of smuggling activity surrounding their product.

n.    The smuggling activities of the PHILIP MORRIS DEFENDANTS have enabled drug lords to launder their illicit profits. According to the United States Department of Justice, billions of dollars of worth of drug proceeds generated in the United States are laundered through the so-called "black market peso exchange" (BMPE) in Bogota and elsewhere in Colombia. These narcotics-generated proceeds supply the funds for the movement of billions of dollars worth of smuggled U.S. and foreign goods, including cigarettes, into Colombia. In short, what starts out as drug currency on the streets of U.S. cities ends up as smuggled goods, including cigarettes, on the streets of Colombia. And significantly, this dollar-for-peso exchange on Colombia's black market fuels the illicit drug trade that is the scourge of both the U.S. and Colombia. Representatives of the PHILIP MORRIS DEFENDANTS are on actual notice that the source of funds used to purchase their cigarettes is drug trafficking, yet they continue to receive these funds and to sell cigarettes to these persons. By reason of this conduct, the PHILIP MORRIS DEFENDANTS aid and abet the efforts of drug lords to launder their ill-gotten gains.

o.    Employees of the PHILIP MORRIS DEFENDANTS were personally involved in the laundering of the proceeds of illicit narcotics sales. Various employees of the PHILIP MORRIS DEFENDANTS personally traveled to Colombia and entered the country illegally, paying bribes to ensure that their passports were not marked so as to reflect that they had entered Colombia. These employees on multiple occasions received large volumes of cash that they took into their personal possession or these employees would be present when large volumes of cash were turned over to the distributors with whom the PHILIP MORRIS

23

employees were traveling.  These individuals would then smuggle the cash out of Colombia and into Venezuela, with the cash ultimately being deposited in banks and transferred into the coffers of the PHILIP MORRIS DEFENDANTS.  The PHILIP MORRIS DEFENDANTS were fully aware of the illegal nature of their activities as is evidenced by the fact that their employees went to great lengths to ensure that there was never an indication on their passports that they had ever been in the country of Colombia.

        p.      The employees of the PHILIP MORRIS DEFENDANTS received the aforesaid cash knowing that it was the proceeds of illegal activity including smuggling on the "black market," money laundering, and fraud.  Furthermore, it was well known to the PHILIP MORRIS DEFENDANTS and to the "distributors" who had arranged the sales that there were risk factors associated with dealing with the cigarette smugglers and receiving "black market" currency in exchange for the cigarettes.  As a result, the price of the cigarettes and the financing agreements by which the cigarettes would be sold was specifically negotiated to take into account the risk factors involved in such illegal transactions.  In the case of virtually every such transaction, there were wire communications by telephone and/or facsimile between distributors in the Caribbean, Panama, and elsewhere, and employees of PHILIP MORRIS DEFENDANTS located in New York, Miami, and/or Virginia – all of which furthered the scheme and deprived Plaintiffs of money and property.

        q.      The PHILIP MORRIS DEFENDANTS knowingly and intentionally shipped large volumes of cigarettes to individuals and corporations in certain free trade zones such as the Colon Free Trade Zone in Panama.  These sales were made to companies that were known smugglers and/or known money launderers.  Although the ultimate destination of these cigarettes was not Panama, the PHILIP MORRIS DEFENDANTS shipped these cigarettes to

Panama so that the money launderers could use the secrecy laws of the Republic of Panama as a

shield by which to divert the cigarettes to their ultimate destinations without being scrutinized by

the agencies and governments to whom customs duties would be owed on these cigarettes. A

substantial percentage of these cigarettes were ultimately smuggled into THE DEPARTMENTS

OF THE REPUBLIC OF COLOMBIA. Shipments of this type occurred throughout the 1990s.

Shipments of this type continue until the present day. As recently as March 9, 2000, two

container loads of PHILIP MORRIS cigarettes were shipped into Panama as a part of the

smuggling scheme. The cigarettes in question were produced in the United States by the PHILIP

MORRIS DEFENDANTS, shipped to warehouses in Antwerp, Belgium, trucked to Rotterdam,

shipped from the Port of Rotterdam to Panama, and would have been smuggled into THE

DEPARTMENTS OF THE REPUBLIC OF COLOMBIA but for the fact that the cigarettes were

seized by Panamanian customs authorities on March 9, 2000.

        r.      As of approximately 1990, the trade name "Belmont" was owned by BAT

in Venezuela, but was owned by the PHILIP MORRIS DEFENDANTS in Colombia. However,

the Belmont trademark was not being used by the PHILIP MORRIS DEFENDANTS in

Colombia in that no Belmont cigarettes were being produced for sale in Colombia. In the early

1990s, BAT began to sell large volumes of Belmont cigarettes in Colombia. Under the laws in

Colombia and most South American countries, the owner of a trademark can lose the rights to

that trademark if the trademark is not used. Accordingly, in the early 1990s, the PHILIP

MORRIS DEFENDANTS were in a position where they may lose their rights to the Belmont

trademark if they did not begin selling Belmont cigarettes in Colombia. In order to avoid this

possibility, the PHILIP MORRIS DEFENDANTS began manufacturing Belmont cigarettes in

Ecuador and smuggling them into Colombia through a number of entry points, including the City

of Ipiales. However, due to lack of market demand, there were not enough sales of the Belmont cigarettes to allow the PHILIP MORRIS DEFENDANTS to adequately defend their trademark. Accordingly, in approximately 1992, the PHILIP MORRIS DEFENDANTS launched a more aggressive smuggling campaign by which a larger volume of Belmont cigarettes manufactured in Ecuador would be smuggled into Colombia through Panama and the Caribbean. It was not possible for the PHILIP MORRIS DEFENDANTS to ship these cigarettes through their normal smuggling distributors, because those distributors did not wish to compete with the BAT distributors who were selling large volumes of BAT's Belmont cigarettes in Colombia. As a result, the PHILIP MORRIS DEFENDANTS engaged in the direct smuggling of their product into Colombia. From approximately 1992 through 1994, the PHILIP MORRIS DEFENDANTS, through their employees and executives, smuggled Belmont cigarettes from Ecuador into Colombia through various routes. In approximately 1994, BAT filed legal claims in Colombia to entitle them to register their Belmont trademark in Colombia. In response to this initiative, the PHILIP MORRIS DEFENDANTS started an umbrella operation by which they could, for the first time, legally sell their Belmont cigarettes in Colombia. These activities resulted in a legal ruling that ultimately resulted in both the PHILIP MORRIS DEFENDANTS and BAT being allowed to sell Belmont cigarettes in Colombia. However, even after that ruling, the majority of the Belmont cigarettes manufactured by the PHILIP MORRIS DEFENDANTS that were ultimately consumed in Colombia were smuggled into Colombia. The PHILIP MORRIS-made Belmont cigarettes were smuggled into Colombia at least until 1999.

s.      Throughout the 1990s and continuing into the year 2000, the PHILIP MORRIS DEFENDANTS have continued to knowingly sell cigarettes to smugglers or distributors who sell to smugglers and have gone to great lengths to conceal this fact from the

various law enforcement agencies and customs agencies around the world charged with the

monitoring of cigarette sales.  For example, throughout 1999 and into the year 2000, the PHILIP

MORRIS DEFENDANTS on numerous occasions notified prosecutors and customs officials

within the government of Panama that there is currently no authorized dealer in the Colon Free

Trade Zone in Panama for the tobacco products of the PHILIP MORRIS DEFENDANTS.

However, the PHILIP MORRIS DEFENDANTS continue to sell their products to persons in the

Colon Free Trade Zone and conceal these activities.  For example, on January 17, 2000, Philip

Morris World Trade S.A., an instrumentality of the PHILIP MORRIS DEFENDANTS, sold 440

cases of Marlboro and Marlboro Lights cigarettes to Weitnauer Services Ltd. of Basel,

Switzerland.  The PHILIP MORRIS DEFENDANTS claim to have no knowledge of where the

cigarettes went after they were sold to Weitnauer.  However, in fact, the delivery note reflecting

the delivery of those cigarettes was faxed by way of U.S. wire to one Marco Shrem, in the Colon

Free Zone.  Marco Shrem is the owner of a company in the Free Zone called Marksman Latin

America S.A.  In spite of the fact that the confirmation of the sale was sent to Mr. Shrem,

Weitnauer ostensibly did not sell the cigarettes to Mr. Shrem or to any company of which he is

an officer.  Rather, Weitnauer ostensibly sold the cigarettes to a company called Interduty Free

Tulcan for delivery to a warehouse in Antwerp, Belgium.  Interduty Free Tulcan ostensibly

shipped the cigarettes to Interduty Free Panama Inc. located in Panama.  However, that notice of

shipment included notification to a company known as J. F. Hillebrand, U.S.A., Inc. located in

Hollywood, Florida.  The bills of lading and other pertinent documents relative to this shipment

were delivered to Hillebrand U.S.A., Inc. by way of the U.S. wires and/or mails on or about

February 17, 2000.  The cigarettes in question were ostensibly destined for Ecuador and the

declarations of commercial movement indicate that the cigarettes should have been shipped

through the Panama Canal without being offloaded and delivered straight to Ecuador. However, when the cigarettes arrived in Panama, they were offloaded and placed in a warehouse without the proper declarations being prepared. As a result of the illegal unloading of the cigarettes, the cigarettes were seized by Panamanian customs authorities. At the time Panamanian customs authorities seized the cigarettes, they discovered Marco Shrem's employees removing the numbers and markings from the cases of Marlboro cigarettes. Even though all documents indicate that the cigarettes are the property of Interduty Free Panama Inc., Marco Shrem has appeared before the Panamanian customs authority with documentary proof from the PHILIP MORRIS DEFENDANTS that the cigarettes belong to him and to Marksman Latin America S.A. Because the PHILIP MORRIS DEFENDANTS provided proof that the cigarettes belonged to Marksman Latin America S.A., the cigarettes were eventually released to that company. They were then, under the watchful eye of Panamanian customs authorities, sold to individuals who it is believed took them to Colombia. Because the cigarettes in question were seized, it is not possible to know the intended destination of these cigarettes had they not been seized. However, shipping records relative to Marksman Latin America S.A. demonstrate that a large proportion of the products purchased and sold by this company are smuggled illegally into Colombia or smuggled illegally into Europe. The PHILIP MORRIS DEFENDANTS indisputably have knowledge as to the true buyer of the cigarettes by virtue of the fact that the PHILIP MORRIS DEFENDANTS sent the pertinent delivery documents to Marco Shrem. The knowledge that the cigarettes were being sold into smuggling channels is demonstrated by the convoluted process by which PHILIP MORRIS DEFENDANTS sold the cigarettes so as to conceal from law-enforcement agencies the identity of the ultimate purchaser.

t.      A company known as "Catana" is a wholly owned subsidiary of PHILIP MORRIS DEFENDANTS. Catana exported Astor cigarettes to the Caribbean, which were then shipped into Colombia and/or Venezuela without any duty being paid.

u.      The PHILIP MORRIS DEFENDANTS made arrangements by which smugglers and those who distributed to smugglers could pay for their cigarettes in Switzerland so as to avoid detection of these payments. In fact, PHILIP MORRIS has moved the records concerning many of its illegal activities worldwide to Switzerland so as to escape the surveillance of the governments which are victimized by PHILIP MORRIS' illegal activities.

v.      The PHILIP MORRIS DEFENDANTS, through the words and actions of their agents and employees, falsely represented to the law enforcement agencies of various governments, including the Republic of Colombia and THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, that they were attempting to combat smuggling when, in fact, they were actively supporting smuggling. While concealing their complicity in smuggling, the PHILIP MORRIS DEFENDANTS engaged in a widespread public-relations campaign, carried out through use of the mails and the wires, condemning "high taxes" as the cause of smuggling, which campaign induced various governments around the world to reduce or eliminate certain cigarette taxes and incur economic injury.

w.      The PHILIP MORRIS DEFENDANTS specifically design and/or redesign the packaging of their cigarettes so as to make it difficult for customs officials in various countries to identify cigarettes that have been smuggled.

x.      Within South America, the priority market within the region historically has been Colombia. The PHILIP MORRIS DEFENDANTS, throughout the 1990s, were engaged in a battle for market share in South America and in particular in Colombia even as to

29

brands that were not legally sold within those countries. The dominant brand in the region was Marlboro, manufactured by the PHILIP MORRIS DEFENDANTS. This was true even as to the "transit market" which is another industry euphemism for smuggled cigarettes. Marketing strategies were created for both legally sold and smuggled cigarettes by the PHILIP MORRIS DEFENDANTS.

        y.      In April 1991, a competitor of PHILIP MORRIS DEFENDANTS conducted an extensive analysis of the marketing strategy of PHILIP MORRIS DEFENDANTS in Colombia. It confirms that the PHILIP MORRIS DEFENDANTS utilized a marketing strategy for Colombia by which the PHILIP MORRIS DEFENDANTS sold their products to particular agents in the Caribbean and the Panama Free Zone who would, in turn, sell the cigarettes to the Colombian customers. It further discusses the fact that Marlboro is sold at "full price" in Colombia. The document also states:

> Importance to Parent:
>
> The Colombia operation in highly profitable for P.M. [Philip Morris] in view of their full-price strategy for MARLBORO with its in-market sales volume estimated at approximately 3 billions per year.

This document confirms the fact that the PHILIP MORRIS DEFENDANTS were knowingly engaged in a massive smuggling scheme given that, as of the date of this document, the PHILIP MORRIS DEFENDANTS had no legal sales of Marlboro cigarettes in Colombia whatsoever. At the time of this memorandum, the PHILIP MORRIS DEFENDANTS were just beginning to initiate a program whereby their cigarettes could be legally sold in Colombia and the PHILIP MORRIS DEFENDANTS had no direct sales into Colombia. Accordingly, the "3 billions per year" (believed to mean three billion cigarettes per year) were all smuggled cigarettes.

z.      The PHILIP MORRIS DEFENDANTS developed a strategic plan for the Latin America region for the years 1991 through 1993. That plan analyzes each country in Latin America, but fails to specifically analyze Colombia because in 1991 there were no direct sales of PHILIP MORRIS DEFENDANTS cigarettes in Colombia. However, within the documents the PHILIP MORRIS DEFENDANTS identify key customers who were buying cigarettes prior to and during 1991 from the PHILIP MORRIS DEFENDANTS. Those customers were, in fact, selling their cigarettes in Colombia and this fact was well known to the PHILIP MORRIS DEFENDANTS. This document was transmitted to various personnel within the PHILIP MORRIS DEFENDANTS in the United States by way of the U.S. mail and/or wire transmissions.

aa. Even prior to the time in which the PHILIP MORRIS DEFENDANTS were themselves legally allowed to sell their cigarettes in Colombia, the PHILIP MORRIS DEFENDANTS were actively selling their cigarettes to several major customers who they knew were illegally selling their cigarettes in Colombia. PHILIP MORRIS DEFENDANTS' documents reflect their customers and accounts receivable as to various customers. The documents specifically refer to primary clients who sold cigarettes continually for PHILIP MORRIS DEFENDANTS both before and after it was legal to sell PHILIP MORRIS DEFENDANTS products in Colombia. Some of these individuals are well known to be involved in criminal activities, such as money laundering. In spite of the fact that the PHILIP MORRIS DEFENDANTS were well aware of these individuals' activities, they continued to, and to the best knowledge of the Plaintiffs, still continue to sell large quantities of PHILIP MORRIS DEFENDANTS cigarettes to these individuals so that they can sell them illegally in Colombia. The strategic plan for Latin America, including Colombia, was developed and implemented by

the Defendant, PHILIP MORRIS INTERNATIONAL, INC. The strategic plan was developed

by PHILIP MORRIS INTERNATIONAL, INC. in its offices in New York and distributed to at

least sixteen officers and/or employees within the PHILIP MORRIS DEFENDANTS. The 1991-

1993 strategic plan does not mention Colombia by name because as of 1991 there were no legal

sales of PHILIP MORRIS cigarettes in Colombia. However, under the heading "DUTY FREE,"

the strategic plan notes sales of 3.4 billion cigarettes in 1990 with volume expected to reach 3.9

billion cigarettes in 1993. The document also reflects that the majority of cigarettes sold under

the guise of "duty free" are, in fact, being sold to "tax-free customers" who are, in fact,

individuals known to the PHILIP MORRIS DEFENDANTS as selling virtually all of their

cigarettes to smugglers in Colombia.

   bb.  Beginning in the 1990s, the PHILIP MORRIS DEFENDANTS engaged in

price fixing in regard to South America and, in particular, Colombia. A letter dated August 26,

1991, from one of PHILIP MORRIS DEFENDANTS' competitors sets forth the PHILIP

MORRIS DEFENDANTS' marketing strategy in South America. The document sets forth the

PHILIP MORRIS DEFENDANTS' strategy in regard to transit (smuggled) cigarettes in South

America. The document states among other things:

> PMI [Philip Morris] has Belmont from Ecuador positioned as the cheapest transit
> brand in 20's though some Minister is now being sold on the streets at the same
> price.

The document goes on to state:

> PMI has reduced the price of Parliament transited into Colombia to US$ 170 per
> case and has other International Brands like L & M waiting.

The document further states:

> Scull [a Philip Morris executive] demands that Bigott's BES and Belmont Largos
> are the same price in exports. That is a bluff.

This document clearly demonstrates the ongoing battle between the PHILIP MORRIS DEFENDANTS and their competitors for market share in Colombia and the fact that the PHILIP MORRIS DEFENDANTS were actively using smuggling as a means to enhance their market share.

cc.     A 1993 report from one of the PHILIP MORRIS DEFENDANTS' competitors provided a detailed analysis of both the legal and smuggled cigarette market in Colombia. In the report the author specifically noted that Marlboro Reds were "dominant No. 1 D.N.P. brand in Cali. Large billboards +- 150 placed in capital cities." As to the PHILIP MORRIS DEFENDANTS' Parliament, the report stated: "Good D.N.P. distribution (60%) in Bogota. [P]rice reduction last year helped trade push it through." This document further demonstrates the extent to which the PHILIP MORRIS DEFENDANTS treated smuggled cigarettes as a key part of their business.

dd.     As of 1995, the PHILIP MORRIS DEFENDANTS were actively and aggressively promoting smuggling as a way to destabilize markets and increase market share in Latin America.

ee.     Throughout the 1990s, the PHILIP MORRIS DEFENDANTS have been involved not only in the smuggling of cigarettes, but also the fixing of prices on smuggled cigarettes throughout the world. The fixing of prices is essential to maintaining the Defendants' control over the smuggling operation. A conspiracy between the PHILIP MORRIS DEFENDANTS and other cigarette companies to fix prices on smuggled cigarettes and to coordinate smuggling activities in South America began at a meeting at the John F. Kennedy International Airport in Queens, New York, on February 14, 1992. That meeting was attended by Peter Schreer and Fred Hauser representing the PHILIP

MORRIS DEFENDANTS.  At that meeting, to the best knowledge of the Plaintiffs, the

PHILIP MORRIS DEFENDANTS and other cigarette companies met for the first time to

set forth a strategy to coordinate their illegal activities in South America.  At that

meeting, it was agreed that there would be future meetings.  This meeting, as well as

others among these parties, was arranged and conducted through the Defendants' use of

the interstate and/or foreign wires and mails inasmuch as it was the custom and practice

of Defendants to coordinate scheduling of, and make arrangements and reservations for,

such meetings through use of the wires and mails shortly before the time of the meeting,

and to circulate the minutes of the meetings through the mails and/or facsimile wire

transmissions shortly after the time of the meeting.

       ff.      As a consequence of the meeting at John F. Kennedy International

Airport in February 1992, a follow-up meeting was held on August 5, 1992, between

representatives of the PHILIP MORRIS DEFENDANTS and representatives of other

cigarette companies.  At that meeting, the PHILIP MORRIS representatives discussed not

only a price-fixing scheme for legally sold cigarettes, but also a price-fixing scheme for

smuggled cigarettes in South America.  The minutes of that meeting specifically refer to

the setting of a price on "DNP" cigarettes in South America.  "DNP" stands for "duty not

paid" and is the industry euphemism for smuggled cigarettes. The PHILIP MORRIS

DEFENDANTS' representatives who attended and directed this meeting were Peter

Schreer, President of the Latin-American Region for PHILIP MORRIS, Rafael Arguelles,

Vice-President for the Latin-American Region for PHILIP MORRIS, and Fred Hauser,

Vice-President for Central America, Puerto Rico, and Dominican Republic for PHILIP

MORRIS.  This meeting was arranged by the participants through the use of the U.S.

wires and/or mails including communications between Peter Schreer in New York and

the representative of the other cigarette companies on June 18, 1992. In fact, agreements

between the PHILIP MORRIS DEFENDANTS and other cigarette companies on price-

fixing of cigarettes continued throughout the 1990s in spite of the fact that it was known

by these Defendants that price fixing was illegal.

        gg.    At the meeting of August 5, 1992, the representatives of the PHILIP

MORRIS DEFENDANTS agreed that they should explore a common industry lobby position on

the "Andean Pack" [sic] particularly for Venezuela and Colombia. Among other purposes, this

industry lobby position was intended to be used as a vehicle to fight increased cigarette taxes. It

was agreed that the industry lobby position would be coordinated through Cesar Rodriguez,

PHILIP MORRIS DEFENDANTS' public affairs man in New York.

        hh.    The PHILIP MORRIS DEFENDANTS were conspirators and direct

participants in the affairs of the smuggling enterprise, and each participant in the conspiracy is

responsible for the actions of the others in pursuit of the smuggling scheme. Acting for the

benefit of the PHILIP MORRIS DEFENDANTS, and with the knowledge and authorization of

corporate executives of the PHILIP MORRIS DEFENDANTS, the PHILIP MORRIS

DEFENDANTS, acting with and through their conspirators, agents and employees, carried out

the foregoing activities to facilitate the smuggling scheme.

        ii.    The acts and omissions of the individuals employed by the PHILIP

MORRIS DEFENDANTS are imputed to the PHILIP MORRIS DEFENDANTS under the

doctrines of vicarious liability and respondeat superior. The PHILIP MORRIS DEFENDANTS

actually benefited from the performance of predicate acts through increased sales, profits, brand

name recognition, and market share. The PHILIP MORRIS DEFENDANTS and their

employees were central figures and aggressors in the fraudulent scheme, and PHILIP MORRIS

personnel and executives performed their fraudulent acts on behalf of the PHILIP MORRIS

DEFENDANTS within the scope and course of their employment with PHILIP MORRIS

DEFENDANTS.

jj.     The PHILIP MORRIS DEFENDANTS are liable under principles of

agency.  Each of the PHILIP MORRIS DEFENDANTS is responsible for the conduct of its

supervisory employees who had either intentionally disregarded the law and violated the

PLAINTIFFS' rights or had acted with plain indifference or willful blindness to the law and

PLAINTIFFS' rights.

kk.     During all relevant times, the PHILIP MORRIS DEFENDANTS

communicated with each other and with their co-conspirators on virtually a daily basis, by means

of interstate and international mails and wires, as a means of obtaining orders for cigarettes,

arranging for sale and shipment of contraband cigarettes, and arranging for and receiving

payment for the cigarettes in question.

ll.     The PHILIP MORRIS DEFENDANTS and/or their co-conspirators

utilized the United States and international mails and wires, and other means of communications,

to prepare and transmit documents that misstate the ultimate destination and value of the

cigarettes in question so as to mislead the authorities within the United States and Colombia in

regard to the actual destination and value of cigarettes that are transported into Colombia.  The

Republic of Colombia reasonably relied on said misrepresentations of fact and material

omissions in accounting for the cigarettes in question and assessing customs duties on cigarettes

entering the Republic of Colombia, and THE DEPARTMENTS OF THE REPUBLIC OF

COLOMBIA were damaged as a result of such reliance.

mm.    The Defendants, their subsidiary corporations, and their co-conspirators use the United States mail and telephonic and other wire forms of communication on a continual basis to pay for the smuggled cigarettes, confirm billing and payment for the smuggled cigarettes, to account for the payment of the smuggled cigarettes to the Defendants and their subsidiaries, and to maintain an accounting of the proceeds received by the Defendants from the sale of the illegal cigarettes, with said proceeds ultimately being returned to the Defendants in the United States.

nn.    The Defendants' co-conspirators, the distributors and smugglers, utilize the United States mail and wire communications on a continuing basis in order to determine marketing strategies, order cigarettes, arrange for sale of the cigarettes, arrange for distribution of cigarettes, arrange for payment of cigarettes, and to support other aspects of the smuggling scheme.

oo.    At all relevant times, the PHILIP MORRIS DEFENDANTS devised, or intended to devise, a scheme or artifice to defraud Plaintiffs and used, or caused the use of, mail and wire communications in interstate and foreign commerce to further the scheme. The scheme to defraud and cheat was inconsistent with moral uprightness, fundamental honesty, fair play and right dealing in the general and business life of members of society.  In the execution of or attempt to execute this scheme, Defendants used the United States interstate and foreign mail in violation of 18 U.S.C., Sections 2 and 1341, and interstate and foreign wires, radio, and television, in violation of 18 U.S.C., Sections 2 and 1343.

pp.    In that the illegal sale of cigarettes into THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA is a multi-million dollar per year operation and is ongoing on a

daily basis, it is impractical and impossible to delineate each fraudulent communication in what is a pervasive and ongoing use of the mails and wires in furtherance of the smuggling activities.

qq.     The PHILIP MORRIS DEFENDANTS, in addition to using the mail and wire communications themselves, caused the mailing and use of wire communications in that they acted with knowledge that the use of the mail and/or wire communications would follow in the ordinary course of business and/or could be reasonably foreseen as a result of their activities; and the mailing or use of wire communications was for the purpose of executing the scheme, to wit, the smuggling activities.   The aforesaid mail and wire transmissions furthered the scheme and were incidental to an essential part of the scheme in that the aforesaid communications were necessary for the co-conspirators, who were separated by great distances, to effectuate their common goals within the smuggling enterprise.

rr.     The PHILIP MORRIS DEFENDANTS have used, and continue to use, the wires, mails, and the internet to further their scheme to defraud Plaintiffs and deprive them of money and property, while attempting to conceal their complicity in the smuggling scheme.

The PHILIP MORRIS DEFENDANTS have falsely denied their complicity in smuggling activities.  (i.)  The PHILIP MORRIS DEFENDANTS falsely denied involvement in smuggling, and claimed that the smuggling was "unfairly" conducted by "someone who carries [Philip Morris] products."  Letter from Elizabeth Cho, spokesperson for PHILIP MORRIS INTERNATIONAL, INC., to Center for Public Integrity, Washington, D.C., sent by facsimile transmission in late January or February 2000; (ii.)  The PHILIP MORRIS DEFENDANTS falsely announced:  "We will not condone, facilitate or support contraband or money laundering," but failed to disclose that the PHILIP MORRIS DEFENDANTS controlled, directed, and profited from smuggling activities for many years.  Letter from Elizabeth Cho,

spokesperson for PHILIP MORRIS INTERNATIONAL, INC. to the Center for Public Integrity

in Washington, D.C., sent by facsimile transmission in January or February 2000; (iii.) On or

about February 1, 2000, in a statement to the *Los Angeles Times*, the PHILIP MORRIS

DEFENDANTS falsely stated: "We believe the amount our Colombian affiliate spent on

advertising was not out of line with the scale of its business there." In fact, there is no rational

basis for the Defendants to conclude that its advertising costs were justified by their volume of

otherwise legitimate, duty-paid sales in Colombia.

    ss.    The PHILIP MORRIS DEFENDANTS have falsely stated that smuggling

was and is outside of their control. Specifically, in or about January or February 2000, the

PHILIP MORRIS DEFENDANTS asserted that "anti-contraband" efforts were the responsibility

of "customs administration, border security forces or the law enforcement departments" of other

countries, but failed to disclose that the PHILIP MORRIS DEFENDANTS are and have been

engaged in distribution to the "black market," and that the Defendants have control over such

distribution. Letter from Elizabeth Cho, spokesperson for PHILIP MORRIS

INTERNATIONAL, INC., to Center for Public Integrity in Washington, D.C., sent by facsimile

transmission in January or February 2000.

    The PHILIP MORRIS DEFENDANTS have falsely asserted that they have cooperated

with governmental efforts to end smuggling. In or about January 2000, the PHILIP MORRIS

DEFENDANTS falsely asserted that they "have been actively involved in supporting

governments' anti-contraband programs in many countries around the world" and that they were

engaged in "on-going discussions regarding a cooperative agreement we have offered the

Colombian government to assist its efforts in fighting contraband." The Defendants failed to

disclose that the PHILIP MORRIS DEFENDANTS are and have been engaged in distribution to

the "black market," and that the Defendants have done all they can to undermine governmental efforts to end smuggling. Letter from Elizabeth Cho, spokesperson for PHILIP MORRIS INTERNATIONAL, INC., to Center for Public Integrity in Washington, D.C., sent by facsimile transmission in January or February 2000.

The PHILIP MORRIS DEFENDANTS have falsely stated that smuggling is caused by high taxes. In or about January or February 2000, the PHILIP MORRIS DEFENDANTS falsely asserted that smuggling results from "extremely high levels of taxation" and "in some cases, trade restrictions." The Defendants failed to disclose that smuggling was caused by the practices and policies of the PHILIP MORRIS DEFENDANTS. The Defendants further failed to disclose that the PHILIP MORRIS DEFENDANTS are and have been engaged in distribution to the "black market." Letter from Elizabeth Cho, spokesperson for PHILIP MORRIS INTERNATIONAL, INC., to Center for Public Integrity in Washington, D.C., sent by facsimile transmission in January or February 2000.

          tt.      On January 21, 2000, PHILIP MORRIS DEFENDANTS sent a letter to the Colombian Federation of Governors asserting that there was no basis for the Plaintiffs to go forward with this action. The Defendants asserted that a recent decision regarding Guatamala barred this action. In fact, however, the letter contained false statements because the noted decision has no relevance whatsoever to a claim arising from Defendants' racketeering acts taken in pursuit of their scheme to defraud Plaintiffs of business and property and violations of common law. Plaintiffs relied upon the aforesaid false statements to their detriment and have been damaged as a result of the false statements.

        28.      The above-described smuggling enterprise, which is an association-in-fact, has made hundreds of millions of dollars in illegal profits for the Defendants. A large portion of

these illegal profits are returned to the Defendants in their offices and facilities in the United States.

29.     The smuggling of cigarettes has become such a major activity that criminals in both the United States and Republic of Colombia have become involved in these activities. The criminal nature of these activities has become so overwhelming that it will be difficult or impossible for the law-enforcement agencies of the Republic of Colombia to combat cigarette smuggling without cutting off the supply at the source. The Colombian government has sought to reduce the flow of illegal cigarettes out of the Maicao area by setting up a border-guard station to stop and inspect vehicles. The border-guard station was destroyed by smugglers using an anti-tank weapon. Several of the personnel manning that station were killed in the attack. The DIAN, the Colombian customs authority, has attempted to increase its surveillance and enforcement of smuggling in Maicao. As a result of these activities, the DIAN office in Maicao has been attacked and burned to the ground. The Defendants knew or consciously avoided knowledge and/or should have known that the illegal smuggling activities that the Defendants are supporting are being conducted by and/or for the benefit of said criminals.

30.     All the aforesaid activities occurred with both the knowledge and the direction of persons at both middle management and high-level management positions within the Defendant corporations. A substantial percentage of the cigarettes that are utilized in this enterprise are shipped from the United States. The vast majority of the activities of the PHILIP MORRIS DEFENDANTS that are the subject matter of this complaint, including management decisions, and direction of the enterprise were and are conducted by the Defendants in the United States and, more particularly, from the Defendants' offices in the State of New York.

31. The majority of the conduct of the Defendants which is material to this case is conducted by the Defendants in the United States. There is a substantial effect experienced in the United States as a result of the enterprise that is the subject matter of this complaint in that:

a. The Defendants receive, and have received, the profits of said enterprise in the United States.

b. Criminals derive substantial income from the enterprise that they receive in the United States and for which they do not pay federal income tax.

c. Large volumes of false documents have been filed with the United States Customs Service so as to deceive the United States Customs Service and allow the smuggling to continue.

32. The existence of smuggling has been utilized as a public-relations and lobbying tool by which the Defendants have conspired to prevent the United States and the individual states of the United States from raising cigarette taxes by threatening that if taxes are raised there will be smuggling and the related economic problems that have haunted other countries for the past ten years. The Defendants and other cigarette companies provide funding for organizations such as the National Coalition Against Crime that purports to be a citizens group aimed at reducing crime by legitimate means when, in fact, it is nothing more than a public-relations and lobbying front for the tobacco industry.

33. As to all of the predicate acts set forth above, they share the same purpose and the same victim, to wit, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

## VI. DAMAGES AND REMEDIES

34.    The Plaintiffs, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA and SANTA FE DE BOGOTÁ, CAPITAL DISTRICT, are autonomous governmental entities. As a result of the activities of the Defendants, large amounts of cigarettes are smuggled into THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA and the proper taxes are not paid on the aforesaid cigarettes. As a result of the Defendants' wrongful activities, the Plaintiffs, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, have been deprived of the money and property that they would have obtained from the lawful importation and sale of cigarettes.

35.    As a direct and proximate result of the smuggling activities that are conducted, aided, and encouraged by the Defendants, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA are currently losing hundreds of millions of dollars per year. THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA have been deprived of money and property in this manner throughout the 1990s. If the smuggling activities of the Defendants are not stopped, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA will continue to lose money and property in the future. In addition, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA have been required to expend large amounts of money in their efforts to stop smuggling and to recoup funds that they have lost as a result of the activities of the Defendants. In addition, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA have suffered economic losses as a result of the under-invoicing of cigarettes that were otherwise legally imported into Colombia by the Defendants. Said losses will continue into the future, absent judgment in Plaintiffs' favor and injunctive and equitable relief, including an order that:

43

a.      Enjoins the Defendants and their respective agents, servants, officers, directors, employees, and all persons acting in concert with them from selling cigarettes to smugglers or to distributors who sell cigarettes to smugglers or otherwise violating 18 U.S.C. § 1962 or any common law standard; and compels each of the Defendants who have been found to have violated 18 U.S.C. § 1962 and/or any common law standard to disgorge all proceeds derived from any such violation and to make restitution to Plaintiffs.

b.      Enjoins the Defendants and their respective agents, servants, officers, directors, employees, and all persons acting in concert with them from selling cigarettes without proper documentation, shipping records, markings, and similar indicia of compliance with law that will allow the proper tracking of the cigarettes so that they cannot be sold illegally.

c.      Enjoins the Defendants and their respective agents, servants, officers, directors, employees, and all persons acting in concert with them from selling cigarettes to any distributor or any other person who cannot fully and accurately account for where the cigarettes will ultimately be sold.

d.      Enjoins the Defendants and their respective agents, servants, officers, directors, employees, and all persons acting in concert with them from engaging in any practices by which distributors, shippers, or smugglers can pay for the cigarettes in question into offshore corporations, offshore bank accounts, or other locations that limit the ability of Colombian officials to track the sale of cigarettes or the payment for said cigarettes.

e.      Orders the Defendants to create and utilize adequate protocols by which all cigarettes manufactured by the Defendants and all payments made for said cigarettes into THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA can be adequately tracked and

monitored by governmental officials of THE DEPARTMENTS OF THE REPUBLIC OF
COLOMBIA.

      f.     Orders the Defendants to take all reasonable and necessary steps to stop
the smuggling of their products into THE DEPARTMENTS OF THE REPUBLIC OF
COLOMBIA including the addition of any necessary labeling, tracking devices, or other means
that would allow the Defendants themselves and/or offices of THE DEPARTMENTS OF THE
REPUBLIC OF COLOMBIA to track and monitor the movement of cigarettes into and within
THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

      g.     Orders the Defendants to disclose all knowledge within their possession
concerning the names, locations, activities, and procedures of smugglers.

      h.     Orders the Defendants to sell and ship cigarettes in accordance with the
legitimate demand for the cigarettes manufactured by the Defendants such that the only quantity
of cigarettes that are sold to any customer are those which can be demonstrated to be actually
consumed or sold legitimately by that customer.  For purposes of this complaint, all of the
foregoing injunctive and equitable remedies, and those injunctive and equitable remedies that
may hereafter be sought by Plaintiffs or ordered by the Court, shall be referred to herein as:
"Injunctive and Equitable Relief."

COUNT I

(AS TO THE PHILIP MORRIS DEFENDANTS)
(RICO; 18 U.S.C. § 1962(a))

    36.    Plaintiffs restate and reallege paragraphs one (1) through thirty-five (35) and
further allege:

45

37.     The PHILIP MORRIS DEFENDANTS, along with their co-conspirators in the smuggling scheme, including associated distributors, shippers, currency dealers, currency brokers, lobbyists, and other participants in the scheme identified above, were, during the relevant times herein, an association-in-fact of individuals and corporations engaged in, and the activities of which affected, interstate and foreign commerce and thus constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) (the "PM Smuggling Enterprise"). These persons and entities were and are associated in fact for the purpose, among others, of illegally smuggling contraband cigarettes into THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA to the economic detriment of Plaintiffs. The PM Smuggling Enterprise is an ongoing organization whose constituent elements function as a continuing unit for the common purpose of maximizing the sale of tobacco products through illegal means and carrying out other elements of the Defendants' scheme. The PM Smuggling Enterprise has an ascertainable structure and purpose beyond the scope of the Defendants' predicate acts and the conspiracy to commit such acts, and it possesses an infrastructure and chain of command that is distinct and separate from the corporate structure of the PHILIP MORRIS DEFENDANTS. The PM Smuggling Enterprise has engaged in, and its activities have affected, interstate and foreign commerce. The PM Smuggling Enterprise continues to date through the concerted activities of the Defendants to disguise the nature of the wrongdoing, to conceal the proceeds thereof, and to conceal the Defendants' participation in the Enterprise in order to avoid and/or minimize their exposure to criminal and civil penalties and damages. The role of each Defendant in the Enterprise has been set forth above.

38.     In connection with the fraudulent scheme set forth above, and to further its aims, the PHILIP MORRIS DEFENDANTS have engaged in numerous acts of "racketeering activity,"

and each defendant has aided and abetted each other defendant in committing those acts of

"racketeering activity" within the meaning of RICO. 18 U.S.C. §1961, et seq. The PHILIP

MORRIS DEFENDANTS, as well as their co-conspirators, have committed multiple predicate

acts of racketeering including, but not limited to:

      a.    Wire fraud and mail fraud. (18 U.S.C. §§ 1341, 1343, 1961(1)(B)). The

PHILIP MORRIS DEFENDANTS devised a scheme or artifice to defraud or to obtain money by

means of false pretenses, representations, or promises, and used the mails and wires for the

purpose of executing the scheme, and acted with a specific intent to defraud by devising,

participating, and/or abetting the scheme. The timing of the wire and mail communications was

during the course of the conspiracy that covered at least 1991 to 1999. There were hundreds of

telephone conversations and faxes on virtually a daily basis during the course of the conspiracy.

These telephone conversations furthered the scheme by maintaining an adequate and consistent

supply of cigarettes to fuel the illicit sales in THE DEPARTMENTS OF THE REPUBLIC OF

COLOMBIA and were part of a clandestine system for the remittance of the proceeds of the

scheme to the PHILIP MORRIS DEFENDANTS. The PHILIP MORRIS DEFENDANTS,

acting through their employees, agents, and co-conspirators, made or caused to be made such

telephone calls to further the scheme. The PHILIP MORRIS DEFENDANTS knew or should

have foreseen that their co-conspirators, in the course of carrying out the PHILIP MORRIS

DEFENDANTS' directions and orders, would use or cause to be used the interstate and

international wires and mails. The motive for committing fraud is plain: money not paid to

Plaintiffs meant increased profits and market share for the PHILIP MORRIS DEFENDANTS.

      b.    Violation of the Travel Act. (18 U.S.C. §§ 1952, 1961(1)(B)).

Defendants traveled in interstate or foreign commerce, and used facilities in interstate and

47

foreign commerce, including the mail, with intent to distribute the proceeds of unlawful activity, and promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of unlawful activity, and thereafter performed, or attempted to perform unlawful activity. Defendants knew that the currency provided to them represented the proceeds of unlawful activity, including trafficking in narcotics and controlled substances and that, by accepting such payments, aided the efforts of the drug traffickers to launder their ill-gotten gains and fuel the Black Market Peso Exchange. Defendants, and their representatives and co-conspirators, traveled across national borders and otherwise used the facilities of foreign commerce in order to distribute the proceeds of unlawful activity to the benefit of the PHILIP MORRIS DEFENDANTS. By this conduct, defendants promoted, managed, established, and facilitated such unlawful activity.

c. Money Laundering. (18 U.S.C. §§ 1956(a)(1), 1961(1)(B)). The Defendants, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted or attempted to conduct financial transactions in interstate and foreign commerce involving the proceeds of specified unlawful activity with intent to promote the carrying on of specified unlawful activity; or, knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source of ownership, or the control of the proceeds of specified unlawful activity, or, knowing that the transaction is designed in whole or in part to avoid a transaction reporting requirement under State or Federal law. Defendants knew that the currency that they received in exchange for the smuggled cigarettes represented the proceeds of specified unlawful activity, including but not limited to, wire fraud, mail fraud, and violations of the Travel Act, and an offense against a foreign nation involving the manufacture, importation, sale or distribution of a controlled

48

substance. Defendants knowingly conducted and attempted to conduct such financial

transactions with intent to promote the carrying on of such unlawful activity. In addition,

defendants knowingly conducted and attempted to conduct such financial transactions with intent

to conceal or disguise the nature (proceeds of racketeering activity and smuggling), the location

(proceeds generated by activity on the "black market" in South America), the source (drug

traffickers, money launderers, smugglers), or the control (PHILIP MORRIS DEFENDANTS) of

the proceeds of specified unlawful activity. Finally, defendants knowingly conducted and

attempted to conduct such financial transactions to avoid a transaction reporting requirement

under State or Federal law, including, but not limited to, currency and monetary instrument

reports.

       d.     International Money Laundering. (18 U.S.C. §§ 1956(a)(2), 1961(1)(B)).

Defendants transported, transmitted, and/or transferred a monetary instrument or funds to a place

in the United States from or through a place outside the United States, with intent to promote the

carrying on of specified unlawful activity, or, knowing that the monetary instrument or funds

involved in the transportation, transmission, or transfer represented the proceeds of some form of

unlawful activity and knowing that such transportation, transmission, or transfer is designed in

whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the

control of specified unlawful activity, or to avoid a transaction reporting requirement under State

or Federal law. By such conduct, Defendants engaged in financial transactions within the

meaning of 18 U.S.C. § 1956(c)(4). Defendants knew that the money orders and funds that were

sent from South America and received in New York and elsewhere in the United States

represented the proceeds of specified unlawful activity, including but not limited to, wire fraud,

mail fraud, and violations of the Travel Act, and an offense against a foreign nation involving the

manufacture, importation, sale or distribution of a controlled substance. Defendants also aided and abetted violations of 18 U.S.C. § 1956(a)(1) and § 1956(a)(2).

       e.       Conspiracy to Engage in Money Laundering. (18 U.S.C. §§ 1956(h), 1961(1)). Defendants conspired to commit offenses defined in 18 U.S.C. § 1956 – including § 1956(a)(1) and § 1956(a)(2). Defendants, by their words and actions, agreed to accept currency, monetary instruments, and funds with the knowledge that the currency, monetary instruments, and funds represented the proceeds of specified unlawful activity conducted by themselves and their co-conspirators. Defendants adopted the common purpose of the conspiracy and participated in its consummation. The goal of the money laundering conspiracy was to deprive Plaintiffs of money and property, while assuring that the profits derived from smuggling activities were repatriated to the benefit of the PHILIP MORRIS DEFENDANTS in a clandestine manner to avoid detection and prosecution.

       f.       Money Laundering. (18 U.S.C. § 1957, 1961(1)). Defendants knowingly engaged or attempted to engage in monetary transactions in the United States, in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity. 18 U.S.C. § 1957(f)(3) and § 1956(c)(7)(A). Defendants engaged in monetary transactions, including deposits, withdrawals, transfers, or exchanges, in or affecting interstate or foreign commerce, of funds or monetary instruments by, through or to a financial institution. Defendants knew that the monetary transactions received in exchange for the smuggled cigarettes represented the proceeds of specified unlawful activity, including but not limited to, wire fraud, mail fraud, and violations of the Travel Act, and an offense against a foreign nation involving the manufacture, importation, sale or distribution of a controlled substance.

39.     The foregoing acts form a "pattern" of racketeering activity within 18 U.S.C. § 1961(5).  The Defendants and others with whom they have been associated have been related in their common objectives of maximizing global sales of tobacco products and defrauding the Plaintiffs of the money and property to which the Plaintiffs are lawfully entitled.  The Defendants' predicate acts have had the same or similar purposes, results, participants, victims, and methods of commission, and occurred over at least a ten-year period.  The predicate acts have been consistently repeated and are capable of further repetition.

40.     The Defendants conducted or participated, directly or indirectly, in the conduct of the PM Smuggling Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(a), (b), and (c).  The Defendants' pattern of racketeering activities dates from at least January 1, 1985, through the present and threatens to continue in the future.

41.     The PHILIP MORRIS DEFENDANTS used or invested, directly or indirectly, racketeering income, or a part thereof, or the proceeds of such income, to acquire an interest in, establish, and operate, the PM Smuggling Enterprise, which is and was engaged in, or the activities of which affect and have affected, interstate or foreign commerce, in violation of 18 U.S.C. § 1962(a). The PHILIP MORRIS DEFENDANTS were principals in the racketeering scheme.  Plaintiffs suffered multiple injuries to their economic interests as a result of this use and investment of racketeering income.

42.     Specifically, the PHILIP MORRIS DEFENDANTS received the income and proceeds of a pattern of racketeering activity, including an international money-laundering scheme, acts of wire fraud and mail fraud, and violations of the Travel Act.  Upon their receipt of such ill-gotten gains by wire transfers from the smugglers and/or their associates, the PHILIP MORRIS DEFENDANTS used and invested such income and proceeds, or a portion thereof, to

51

acquire an interest in, establish and operate the PM Smuggling Enterprise which was and is engaged in interstate and foreign commerce. In particular, the PHILIP MORRIS DEFENDANTS used the proceeds of the scheme to: (a) operate the PM Smuggling Enterprise; (b) replenish the supply of contraband cigarettes for ultimate sale on the Colombian "black market"; (c) acquire, purchase and subsidize facilities necessary to the PM Smuggling Enterprise, including manufacturing, sales, and distribution operations; (d) compensate employees and agents of the PHILIP MORRIS DEFENDANTS engaged in the smuggling activities; (e) pay expenses incurred in connection with smuggling activities such as telephone bills incurred in the wire fraud scheme, and travel costs incurred by such employees; (f) create umbrella operations which, while operating at a loss, provided the framework which allowed the Defendants to promote the smuggling; and (g) establish a flourishing "black market" for the sale of contraband cigarettes. In sum, the PHILIP MORRIS DEFENDANTS did not reinvest the proceeds of racketeering activity in their general business operations, but instead, used and invested such proceeds to establish the infrastructure of, acquire an interest in, and operate the PM Smuggling Enterprise, and it was this use and investment that harmed Plaintiffs. The Defendants used and invested the proceeds of racketeering activity to acquire an interest in, establish, and operate the PM Smuggling Enterprise, in several ways, including but not limited to the following:

      a.     Proceeds of the sale of billions of cigarettes in 1991 were used to establish the umbrella operation which PHILIP MORRIS DEFENDANTS created in 1992 and which continues through the present.

b.    The profits from cigarette sales were utilized to promote sales of further smuggled products in Colombia, support the umbrella operation in Colombia, and finance the expansion of the conspiracy within Colombia and into other countries in South America.

c.    The profits from the sale of cigarettes smuggled into Colombia finance the sales and marketing operations that promote the increase of those sales in succeeding years.

43.    Plaintiffs were injured in their business and property by reason of the PHILIP MORRIS DEFENDANTS' use and investment of racketeering income to acquire, establish, and operate the PM Smuggling Enterprise. Absent this use and investment of racketeering income, contraband sales to the Colombian "black market" by the PHILIP MORRIS DEFENDANTS and their co-conspirators would have been difficult if not impossible, the infrastructure of the smuggling enterprise could not have been created or functioned, and the economic injury to Plaintiffs would have been avoided in whole or in part.

44.    As a direct and proximate result of the violations set forth above, the Plaintiffs, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, have been injured in their business and property as set forth more fully above in paragraphs thirty-four (34) through thirty-five (35). The Defendants' violations of 18 U.S.C. § 1962(a) caused these losses. Under the provisions of 18 U.S.C. § 1964(c), the Plaintiffs are entitled to bring this action and recover herein treble damages, the cost of bringing the suit, pre-judgment interest, and reasonable attorneys' fees.

COUNT II

(AS TO THE PHILIP MORRIS DEFENDANTS)
(RICO; 18 U.S.C. § 1962(b))

45.     Plaintiffs restate and reallege paragraphs one (1) through forty-four (44) and further allege:

46.     The PHILIP MORRIS DEFENDANTS acquired or maintained, directly or indirectly, through a pattern of racketeering activity, an interest in and control of the PM Smuggling Enterprise, which was and is engaged in, or the activities of which affect and have affected, interstate or foreign commerce in violation of 18 U.S.C. § 1962(b). The Plaintiffs, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, have been injured by the Defendants' acquisition and maintenance of an interest in and control of the enterprise through a pattern of racketeering activity.

47.     The Defendants, acting through a pattern of racketeering activity, acquired or maintained, directly or indirectly, an interest in and control of the PM Smuggling Enterprise which is engaged in, and the activities of which affect, interstate and foreign commerce. Specifically, the PHILIP MORRIS DEFENDANTS maintained control of the PM Smuggling Enterprise by means of racketeering activities, including, for example, (a) interstate and international wire communications in violation of 18 U.S.C., Section 1343 (orders were placed telephonically and the PHILIP MORRIS DEFENDANTS had total control over the enterprise and the distribution of its product); (b) money laundering in violation of 18 U.S.C., Sections 1956 and 1957 (PHILIP MORRIS DEFENDANTS controlled and concealed the flow of the proceeds of the smuggling – a key aim of the scheme – through money laundering); (c) violations of the Travel Act (18 U.S.C., Section 1952 (cross-border travel and transactions that

54

facilitated smuggling and other illicit activities). Through this pattern of racketeering activities, which also included transmitting false statements to government authorities, the PHILIP MORRIS DEFENDANTS were able to acquire and maintain an interest in and control of the PM Smuggling Enterprise. This interest and control furthered, concealed, and protected the operations of the smuggling enterprise, and thereby permitted the PM Smuggling Enterprise to flourish without detection.

48.     As a direct and proximate result of the Defendants' acquisition and maintenance of an interest in and control of the PM Smuggling Enterprise, the Plaintiffs, the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, have been injured in their business and property as set forth more fully above in paragraphs thirty-four (34) through thirty-five (35). The Defendants' violations of 18 U.S.C. § 1962(b) caused these losses. Under the provisions of 18 U.S.C. § 1964(c), the Plaintiffs are entitled to bring this action and recover herein treble damages, the cost of bringing the suit, pre-judgment interest, and reasonable attorneys' fees.

## COUNT III

### (AS TO THE PHILIP MORRIS DEFENDANTS)
### (RICO; 18 U.S.C. § 1962(c))

49.     Plaintiffs restate and reallege paragraphs one (1) through forty-eight (48) and further allege:

50.     The PHILIP MORRIS DEFENDANTS, through the commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participated in the operation or management of the PM Smuggling Enterprise, the activities of which affect interstate or foreign commerce.

51.       At all relevant times, the PHILIP MORRIS DEFENDANTS participated in the operation or management of an "enterprise", within the meaning of 18 U.S.C. § 1961(4). The PHILIP MORRIS DEFENDANTS, acting together and individually, operated, managed, and exercised control of the PM Smuggling Enterprise by, among other things: (a) establishing a money laundering scheme by which the co-conspirators remitted to the PHILIP MORRIS DEFENDANTS the proceeds of the smuggling scheme; (b) compelling the smugglers to sell smuggled cigarettes at a price set by the Defendants; (c) requiring the smugglers to keep detailed records of sales of contraband cigarettes; (d) instructing the smugglers to distribute particular brands of cigarettes in specified markets; (e) providing information to the smugglers to allow them to avoid detection and apprehension; (f) investing and using the proceeds of the smuggling scheme in the enterprise; (g) creating incentives for increased sales on the "black market"; (h) selling and distributing vast quantities of cigarettes at favorable prices; (i) giving credit terms to the smugglers that allowed the PHILIP MORRIS Defendants to control the smuggling scheme; (j) fixing the price of contraband cigarettes in concert with other tobacco companies; (k) coordinating smuggling activities in concert with other tobacco companies.

52.       The money laundering scheme and the communications of the Defendants concerning the operation of the PM Smuggling Enterprise were effectuated through the use of interstate and foreign mails and wires. It was the policy and practice of the PHILIP MORRIS DEFENDANTS that if the smugglers failed to follow the PHILIP MORRIS DEFENDANTS' specific orders, the PHILIP MORRIS DEFENDANTS would shut off the supply of favorably-priced cigarettes to the smugglers, and cut off the lifeblood of the smuggling scheme.

53.       As a direct and proximate result of the violations set forth above, the Plaintiffs, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, have been injured in

their business and property as set forth more fully above in paragraphs thirty-four (34) through

thirty-five (35).  The Defendants' violations of 18 U.S.C. § 1962(c) caused these losses.  Under

the provisions of 18 U.S.C. § 1964(c), the Plaintiffs are entitled to bring this action and recover

herein treble damages, the cost of bringing the suit, pre-judgment interest, and reasonable

attorneys' fees.

COUNT IV

(AS TO THE PHILIP MORRIS DEFENDANTS)
(RICO; 18 U.S.C. § 1962(d))

54.    Plaintiffs restate and reallege paragraphs one (1) through fifty-three (53) and

further allege:

55.    The PHILIP MORRIS DEFENDANTS entered into an agreement with each

other, and with distributors, shippers, currency dealers, and smugglers to join in the conspiracy to

violate 18 U.S.C. §§ 1962(a), 1962(b), and 1962(c).  Each defendant entered into an agreement

to join the conspiracy, and took acts in the furtherance of the conspiracy and knowingly

participated in the conspiracy.  The purpose of the conspiracy was to smuggle cigarettes into

THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA to the economic detriment of

Plaintiffs and to the economic benefit of the PHILIP MORRIS DEFENDANTS.  The

conspirators carried out the scheme and each conspirator was put on notice of the general nature

of the conspiracy, that the conspiracy extended beyond the individual role of any single member,

and that the conspiratorial venture functioned as a continuing unit for a common purpose.  The

PHILIP MORRIS DEFENDANTS adopted the goal of furthering and facilitating the criminal

endeavor.  Their stake in the smuggling venture was in making profits and increasing market

57

share which they knew could come only from their informed and interested cooperation with smugglers, and their active assistance, stimulation, and instigation of the smuggling activities.

56.    The PHILIP MORRIS DEFENDANTS, together with each member of the conspiracy, agreed and conspired to violate: (1) 18 U.S.C. § 1962(a) by using, or causing the use of, income they derived from the above-described pattern of racketeering activities in the acquisition, establishment, and/or operation of the enterprise, the activities of which affect interstate or foreign commerce; (2) 18 U.S.C. § 1962(b) by acquiring or maintaining, or causing the acquisition or maintenance of, through a pattern of racketeering activity, an interest or control in the enterprise, the activities of which affect interstate or foreign commerce; and, (3) 18 U.S.C. § 1962(c) by participating, directly and indirectly, in the operation and management of the affairs of the enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

57.    The PHILIP MORRIS DEFENDANTS participated in and cooperated with each other and with their co-conspirators in the aforementioned conspiracy that enabled each cigarette manufacturer and distributor to enhance its market share, suppress its competition, and promote sale of its products.

58.    As a part of their conspiracy, the PHILIP MORRIS DEFENDANTS retained various lobbyists, funded "research," and conducted a joint public-relations campaign so as to misstate the nature and scope of cigarette smuggling and so as to promote their own interests.

59.    The PHILIP MORRIS DEFENDANTS actively participated in the conspiracy to smuggle cigarettes and to generate false and misleading information concerning smuggling activities.

60.     As a result of the conspiracy, the PHILIP MORRIS DEFENDANTS and their co-conspirators were able to facilitate the smuggling of large volumes of cigarettes into THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

61.     The membership of the conspiracy in question included the PHILIP MORRIS DEFENDANTS, tobacco distributors, the shippers, the smugglers, currency brokers, and the PHILIP MORRIS DEFENDANTS' subsidiary corporations in Switzerland and elsewhere, who act in concert to produce the cigarettes, mislabel or fail to properly label the cigarettes, smuggle and sell the cigarettes, and arrange for payment in a way that is undetectable by governmental authorities, with said payment ultimately being returned to the Defendants in the United States. As co-conspirators, the PHILIP MORRIS DEFENDANTS are liable for all of the actions committed by all of the co-conspirators within the conspiracy and are liable for all of the damages sustained by THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA that were caused by any members of the conspiracy, regardless of whether the PHILIP MORRIS DEFENDANTS were themselves directly involved in a particular aspect of the enterprise.

62.     As a direct and proximate result of the violations set forth above, the Plaintiffs, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, have been injured in their business and property as set forth more fully above in paragraphs thirty-four (34) through thirty-five (35). The Defendants' violations of 18 U.S.C. § 1962(d) caused these losses. Under the provisions of 18 U.S.C. § 1964(c), the Plaintiffs are entitled to bring this action and recover herein treble damages, the cost of bringing the suit, pre-judgment interest, and reasonable attorneys' fees.

## COUNT V

### (AS TO THE PHILIP MORRIS DEFENDANTS)
### (RICO; 18 U.S.C. § 1964(a))

63.     Plaintiffs restate and reallege paragraphs one (1) through sixty-two (62) and further allege:

64.     The United States District Court is empowered to prevent and restrain violations of 18 U.S.C. § 1962 by issuing appropriate orders, including, but not limited to: ordering any person to divest himself or herself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.  18 U.S.C. § 1964(a).

65.     The PHILIP MORRIS DEFENDANTS are currently engaged in the activities set forth within this Complaint that promote and support the smuggling of contraband cigarettes into THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

66.     The Defendants intend to and continue to conduct said activities and to interfere with investigations being done by governmental officials into smuggling activities.

67.     The Defendants, by their conduct of selling cigarettes to smugglers, creating false and misleading documents, improperly labeling shipments of cigarettes, setting up umbrella operations to facilitate the smuggling, and setting forth mechanisms of payment by which smugglers may pay for the cigarettes without being detected by government investigations all

continue to exacerbate the problem of cigarette smuggling in THE DEPARTMENTS OF THE

REPUBLIC OF COLOMBIA and to damage the Plaintiffs.

68.     As a result of the Defendants' conduct in violation of 18 U.S.C. §§ 1962(a),

1962(b), and 1962(c), THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA have been

and continue to be irreparably injured as is alleged more fully above.

69.     As a result of the nature of the smuggling activities, it would be functionally

impossible for THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA to put a complete

halt to said smuggling activities as long as the Defendants continue to provide support for the

smugglers.  In addition, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA continue

to suffer injury to business and property to an extraordinary degree.

70.     Money damages will not provide a full and complete remedy for Defendants'

unlawful conduct.  There is no adequate remedy at law that will protect the Plaintiffs in the

future from these smuggling activities if the Defendants do not cease their involvement and

support of smuggling activities.  Pursuant to 18 U.S.C. § 1964(a), Plaintiffs demand full

Injunctive and Equitable Relief.


COUNT VI

(AS TO THE PHILIP MORRIS DEFENDANTS)
(COMMON LAW FRAUD)


71.     Plaintiffs restate and reallege paragraphs one (1) through seventy (70) and further

allege:

72.     The PHILIP MORRIS DEFENDANTS and their co-conspirators intentionally

falsified documents, falsified shipping records, and generated false and misleading billing

records concerning the payment and/or value for smuggled cigarettes so as to mislead the

Plaintiffs, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, as to the destination

of smuggled cigarettes.  Additionally, the PHILIP MORRIS DEFENDANTS intentionally made

false representations as to the value of their otherwise legally imported product.  The PHILIP

MORRIS DEFENDANTS made these false statements and representations and failed to disclose

material information with intent to defraud the Plaintiffs.  The Defendants made these material

misrepresentations and omissions with the knowledge and intention that the Plaintiffs, THE

DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, would rely on said documents.

Plaintiffs reasonably relied upon the Defendants' misrepresentations, and incurred damage as a

result of such reliance.  Specific examples of the process by which these activities occurred are

set forth above.

73.     The Plaintiffs, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA,

reasonably relied upon said documents as part of their monitoring of the shipment of cigarettes

into THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

74.     Furthermore, the PHILIP MORRIS DEFENDANTS knowingly and intentionally

generated false and misleading information concerning the nature of smuggling in THE

DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, the extent of smuggling in THE

DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, and the causes of smuggling in THE

DEPARTMENTS OF THE REPUBLIC OF COLOMBIA  with the knowledge and intention that

the Plaintiffs, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, would rely upon

said information.

75.   The Plaintiffs, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, did reasonably rely upon data and information provided to them by the Defendants and/or their agents in acting or refraining from acting, with respect to smuggling activities.

76.   The PHILIP MORRIS DEFENDANTS, in under-invoicing their products, falsifying documents to expedite the smuggling of cigarettes, and in providing misleading information concerning the smuggling of cigarettes, acted in willful, wanton, gross, and callous disregard for the rights of the Plaintiffs, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.  The aforesaid actions were knowingly taken for the purpose of supporting the activities of the Defendants' co-conspirators and with the intent of increasing the profits and sales of the Defendants and harming THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

77.   Defendants were duty-bound to disclose the material information concerning the destination of tobacco shipments and their operations that had been concealed.  By law, no person may make false statements to the government.  Having undertaken to make representations to THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, Defendants were obligated to provide full, complete and truthful information concerning the destination of tobacco shipments and their operations.  Defendants had superior, if not exclusive, knowledge of such information, and it was not readily available to the Plaintiffs.  Defendants knew, or should have known, that Plaintiffs would reasonably act, and refrain from acting, on the basis of mistaken knowledge provided to Plaintiffs by Defendants, and PLAINTIFFS did so to their detriment.  Under these circumstances, Defendants' conduct amounts to fraudulent misrepresentation and fraudulent concealment, and an effective conversion of PLAINTIFFS' money and property.

78.     As a direct and proximate result of the PHILIP MORRIS DEFENDANTS' fraud and the Plaintiffs' reasonable reliance upon said fraud, the Plaintiffs have suffered economic damages as are set forth more fully above in paragraphs thirty-four (34) through thirty-five (35). The Plaintiffs demand judgment for damages, both compensatory and punitive, as well as full Injunctive and Equitable Relief.

## COUNT VII

### (AS TO THE PHILIP MORRIS DEFENDANTS)
### (PUBLIC NUISANCE)

79.     Plaintiffs restate and reallege paragraphs one (1) through seventy-eight (78) and further allege:

80.     Plaintiffs are government authorities.

81.     Smuggling of contraband cigarettes is a violation of law and a public nuisance.

82.     The smuggling activities in the United States and THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA of the PHILIP MORRIS DEFENDANTS have substantially and unreasonably injured and endangered, and continue to injure and endanger, the well-being of the general public and the operation of the market for tobacco products in Colombia.

83.     The smuggling activities in the United States and THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA of the PHILIP MORRIS DEFENDANTS have been, and continue to be, effectuated through widespread criminal activity, including mail fraud, wire fraud, money laundering, smuggling and other illegal acts.

84.     The PHILIP MORRIS DEFENDANTS facilitated the smuggling of contraband cigarettes into THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA by means of a

variety of acts and omissions, including the following:  (a)  The PHILIP MORRIS
DEFENDANTS arranged a process by which cigarettes purchased by smugglers could be paid
for by secret payments into Swiss corporations and/or Swiss bank accounts so as to conceal
revenues derived from smuggling activities. (b)  The PHILIP MORRIS DEFENDANTS
provided specific marketing information to smugglers, including which products were in demand
and the volumes of cigarettes that were needed to meet the specific demands of the smugglers'
clients.  (c)  The PHILIP MORRIS DEFENDANTS required the smugglers to keep logs of their
loads, to keep track of where the loads were delivered, and how much the cigarettes were sold
for.  This allowed the PHILIP MORRIS DEFENDANTS to maintain direct, hands-on control of
the entire smuggling process.  The PHILIP MORRIS DEFENDANTS threatened smugglers that
if they did not keep proper records of their smuggling activities, the PHILIP MORRIS
DEFENDANTS would deal with other smuggling customers.  (d) The PHILIP MORRIS
DEFENDANTS failed to properly supervise the distribution of their tobacco products to assure
that such products were not sold illegally.  (e) The PHILIP MORRIS DEFENDANTS failed to
act reasonably when they were put on notice of their involvement with smugglers.  (f)  The
PHILIP MORRIS DEFENDANTS set up umbrella operations to facilitate the smuggling
scheme.

85.    Through these and other acts and omissions, the PHILIP MORRIS
DEFENDANTS have offended, interfered with, and caused damage to the public in the exercise
of rights common to all, in a manner such as to (a) offend public morals, (b) interfere with use by
the public of a public place, (c) endanger and injure the property, life, health safety and comfort
of a considerable number of persons; and (d) injure and interfere with the market for tobacco
products in Colombia.  The acts and omissions of the PHILIP MORRIS DEFENDANTS

constitute a public nuisance. This public nuisance, or some part of it, continues unabated to the detriment of Plaintiffs' economic interests.

86. The PHILIP MORRIS DEFENDANTS knew, or reasonably should have known, that their acts and omissions relating to smuggling of tobacco products created great dangers and other harm to the community, including Plaintiffs' economic interests.

87. The PHILIP MORRIS DEFENDANTS have acted maliciously, wantonly, and with a recklessness that bespeaks an improper motive and vindictiveness, and have engaged in outrageous and oppressive conduct and with a reckless or wanton disregard of safety and rights. Their conduct amounts to a fraud on the public.

88. As a direct and proximate result of the acts and omissions of the PHILIP MORRIS DEFENDANTS, which constitute a public nuisance, Plaintiffs have sustained and continue to sustain economic injury.

89. By reason of the injury to their economic interest due to the public nuisance, as set forth in the preceding paragraphs to this complaint, Plaintiffs are entitled to an award of damages, including actual, compensatory, and punitive damages. In addition, damages do not constitute a full and adequate remedy at law, and for this reason, Plaintiffs are entitled to full Injunctive and Equitable Relief, including a judgment permanently enjoining defendants from the continuation of activities constituting a public nuisance, and compelling defendants to take steps to abate and prevent the smuggling of tobacco products.

## COUNT VIII

### (AS TO THE PHILIP MORRIS DEFENDANTS)
### (UNJUST ENRICHMENT)

90.     Plaintiffs restate and reallege paragraphs one (1) through eighty-nine (89) and further allege:

91.     The PHILIP MORRIS DEFENDANTS were unjustly enriched at Plaintiffs' expense.  The acts and omissions of these defendants and others have placed in the possession of these defendants money under such circumstances that in equity and good conscience they ought not to retain it.

92.     The PHILIP MORRIS DEFENDANTS were unjustly enriched through their smuggling scheme.  By reason of their smuggling scheme, and the avoidance of payment of duties and taxes, the PHILIP MORRIS DEFENDANTS were enabled to sell their product at lower cost, and illegally enhance profits, market share, and the value of the international tobacco operations.

93.     The unjust enrichment of the PHILIP MORRIS DEFENDANTS was accomplished at the expense of Plaintiffs.  By reason of the smuggling scheme, Plaintiffs were, and continue to be, deprived of duties and taxes.

94.     Under these circumstances, the receipt and retention of the money derived from smuggling operations are such that, as between Plaintiffs and Defendants, it is unjust for Defendants to retain it.

95.     Equity and good conscience require the PHILIP MORRIS DEFENDANTS to pay damages and restitution to Plaintiffs, disgorge their ill-gotten gains and, to effectuate these remedies, a constructive trust should be imposed by this Court upon the proceeds obtained by

Defendants by reason of smuggling activities.  Judgment in Plaintiffs' favor should include full

Injunctive and Equitable Relief.


## COUNT IX

### (AS TO THE PHILIP MORRIS DEFENDANTS)
### (NEGLIGENCE)

96.     Plaintiffs restate and reallege paragraphs one (1) through ninety-five (95) and

further allege:

97.     Defendants owed, and continue to owe, a duty of care to Plaintiffs.  Defendants

were and are obligated to avoid negligently causing harm to PLAINTIFFS, and were and are

duty-bound to:

      a.     produce, market, and distribute their cigarette products lawfully and with

due care;

      b.     use due care in the hiring, selection, approval, instruction, training,

supervision, and discipline of employees, agents and other personnel engaged in the production,

marketing, and distribution of their products, some of whom the Defendants knew, or reasonably

should have known, were assisting and otherwise engaged in the smuggling of cigarettes;

      c.     design, implement, and utilize effective monitoring and oversight

procedures to deter and detect smuggling-related activities by its employees and agents;

      d.     investigate and terminate the smuggling-related conduct of their

employees, agents, and business associates particularly inasmuch as their managerial personnel

with decision-making authority were put on reasonable notice of such illicit conduct;

e.      deal with the Plaintiffs, and their representatives, in an honest, good faith, and forthright manner;

f.      terminate sales of their tobacco products to or through persons or entities known to be engaged, directly or indirectly, in smuggling.

98.      As manufacturers, distributors and dominant participants in the marketplace, Defendants had, and continue to have, the authority and ability to prevent smuggling of their products for the protection of Plaintiffs. Reasonable steps could have been taken by the Defendants to prevent or reduce the risk of the sale of their products to persons likely to distribute and sell them on the Colombian "black market."

99.      Defendants, as manufacturers, distributors, and dominant participants in the marketplace, have a special ability, and duty, to detect and guard against the risks associated with the distribution of their products, for the benefit and protection of those foreseeably and unreasonably placed at risk of harm from the distribution of their products, including Plaintiffs.

100.      Defendants' acts and omissions created and enhanced the risk that their products would be distributed on the Colombian "black market" and injure Plaintiffs.

101.      Defendants' acts and omissions affirmatively obstructed PLAINTIFFS' abilities to collect full and proper duties and taxes and otherwise to protect themselves from harms associated with smuggling.

102.      The PHILIP MORRIS DEFENDANTS have acted maliciously, wantonly, and with a recklessness that bespeaks an improper motive and vindictiveness, and have engaged in outrageous and oppressive conduct and with a reckless or wanton disregard of safety and rights. Their conduct amounts to a fraud on the public.

103.   Defendants, acting with and through their employees, agents, and co-conspirators, breached their duty of care, as aforesaid, by acts and/or omissions that posed an unreasonable risk of harm to Plaintiffs.

104.   Defendants' breach proximately caused, and continues to cause, damage to the economic interests of Plaintiffs.

105.   By reason of the injury to its economic interests due to the negligence of the Defendants, as aforesaid, Plaintiffs are entitled to an award of damages, including actual, compensatory, and punitive damages.  In addition, damages do not constitute a full and adequate remedy at law, and for this reason, Plaintiffs are entitled to full Injunctive and Equitable Relief, including a judgment permanently enjoining Defendants from the continuation of activities constituting negligence, and compelling Defendants to take steps to abate and prevent the smuggling of tobacco products in THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

## COUNT X

### (AS TO THE PHILIP MORRIS DEFENDANTS)
### (NEGLIGENT MISREPRESENTATION)

106.   Plaintiffs restate and reallege paragraphs one (1) through one hundred and five (105) and further allege:

107.   Defendants owed, and continue to owe, a duty of care to Plaintiffs.  Defendants were and are obligated to avoid negligently causing harm to Plaintiffs, and were and are duty-bound to: (a)  be truthful in their representations to Plaintiffs and their representatives concerning smuggling, under-invoicing, and other improper activities as aforesaid; and (b) provide Plaintiffs

with such information as Defendants possess concerning the smuggling of Defendants' products into the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

108.   Defendants negligently made various misrepresentations to Plaintiffs and their representatives as aforesaid.

109.   The Defendants have acted maliciously, wantonly, and with a recklessness that bespeaks an improper motive and vindictiveness, and have engaged in outrageous and oppressive conduct and with a reckless or wanton disregard of safety and rights.

110.   Defendants, acting with and through their employees, agents, and co-conspirators, breached their duty of care, as aforesaid, by acts and/or omissions that posed an unreasonable risk of harm to Plaintiffs.

111.   Defendants' breach proximately caused, and continues to cause, damage to the economic interests of Plaintiffs.

112.   By reason of the injury to its economic interests due to the negligence of the Defendants, as aforesaid, Plaintiffs are entitled to an award of damages, including actual, compensatory, and punitive damages.  In addition, damages do not constitute a full and adequate remedy at law, and for this reason, Plaintiffs are entitled to full Injunctive and Equitable Relief, including a judgment permanently enjoining Defendants from the continuation of activities constituting negligence.

DEMAND FOR JUDGMENT

113.   WHEREFORE, the Plaintiffs demand judgment in their favor and against Defendants as follows:

a.   Pursuant to COUNT I, damages, including interest, against the PHILIP MORRIS DEFENDANTS, jointly and severally, the precise amount to be supplied to the Court

71

upon a trial on the merits; treble the actual damages pursuant to 18 U.S.C. § 1964(c), along with an award of the costs of the suit and a reasonable attorney's fee.

    b.  Pursuant to COUNT II, damages, including interest, against the PHILIP MORRIS DEFENDANTS, jointly and severally, the precise amount to be supplied to the Court upon a trial of the merits; treble the actual damages pursuant to 18 U.S.C. § 1964(c), along with an award of the costs of the suit and a reasonable attorney's fee.

    c.  Pursuant to COUNT III, damages, including interest, against the PHILIP MORRIS DEFENDANTS, jointly and severally, the precise amount to be supplied to the Court upon a trial of the merits; treble the actual damages pursuant to 18 U.S.C. § 1964(c), along with an award of the costs of the suit and a reasonable attorney's fee.

    d.  Pursuant to COUNT IV, damages, including interest, against the PHILIP MORRIS DEFENDANTS, jointly and severally, the precise amount to be supplied to the Court upon a trial of the merits; treble the actual damages pursuant to 18 U.S.C. § 1964(c), along with an award of the costs of the suit and a reasonable attorney's fee.

    e.  Pursuant to COUNT V, Injunctive and Equitable Relief against the PHILIP MORRIS DEFENDANTS, jointly and severally along with an award of the costs of the suit and a reasonable attorney's fee.

    f.  Pursuant to COUNT VI, against the PHILIP MORRIS DEFENDANTS, jointly and severally, an award of compensatory and punitive damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

    g.  Pursuant to COUNT VII, against the PHILIP MORRIS DEFENDANTS, jointly and severally, an award of compensatory and punitive damages, with interest, the precise

amount to be supplied to the Court upon a trial of the merits; Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

   h.  Pursuant to COUNT VIII, against the PHILIP MORRIS DEFENDANTS, jointly and severally, an award of compensatory and punitive damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

   i.  Pursuant to COUNT IX, against the PHILIP MORRIS DEFENDANTS, jointly and severally, an award of compensatory and punitive damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

   j.  Pursuant to COUNT X, against the PHILIP MORRIS DEFENDANTS, jointly and severally, an award of compensatory and punitive damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

   k.  Such other and similar relief as the Court deems just, proper, and equitable; and trial by jury as to all issues triable as of right by jury.

Dated: New York, New York
   May 19, 2000

SPEISER, KRAUSE, NOLAN & GRANITO

By: _____
     John J. Halloran, Jr.  (JH-2515)


By _____
    Frank H. Granito, III  (FG-9760)


Kenneth P. Nolan (KN-3388)
Frank H. Granito, Jr. (FG-1969)

Two Grand Central Tower
140 East 45th Street, 34th Floor
New York, New York 10017
212-661-0011 (telephone)
212-953-6483 (facsimile)